INDIANA BELL TELEPHONE
COMPANY INCORPORATED,
Plaintiff-Appellant,

v.

C. T. BOYD, John C. Carvey, Everett J.
Coleman, Nedra Kinerk, James A. Lang,
Mary W. Shafer, David L. Staples, as the
constituent members of the Indiana Civ-
il Rights Commission, and George J.
Luddington, Defendants-Appellees.

No. 1–780A174.

Court of Appeals of Indiana,
First District.

June 9, 1981.

Rehearing Denied July 16, 1981.

Bruce N. Cracraft, Harold L. Folley, Indi-
anapolis, Parr, Richey, Obremskey & Mor-
ton, Lebanon, for plaintiff-appellant.

Linley E. Pearson, Atty. Gen., Bruce G.
Kaufmann, Deputy Atty. Gen., Indianapo-
lis, for defendants-appellees.

NEAL, Presiding Judge.

STATEMENT OF THE CASE

George Luddington initiated these pro-
ceedings by filing a complaint with the
Indiana Civil Rights Commission (Commis-
sion) alleging that his employer, Indiana
Bell Telephone Company (Bell), had com-
mitted a discriminatory act against him on
the basis of race, in violation of the Indiana
Civil Rights Law [1] (Ind. Code 22–9–1 et
seq.). Following a hearing at which evi-

1. Luddington is black.

dence was presented, the hearing officer concluded Bell was "guilty of a discriminatory act," and recommended Bell pay Luddington damages. The hearing officer's findings, conclusions, and recommended order were adopted, with a slight modification relative to the computation of the damages award, by the Commission.

Bell filed an action in Marion Circuit Court seeking review of the administrative determination and, further, seeking injunctive relief, alleging that the Commission's action resulted in impairment of its collective bargaining agreement. The cause was subsequently venued to the Boone Circuit Court.

The trial court found on judicial review that the Commission's Findings of Fact and Conclusions of Law were supported by substantial and probative evidence and upheld its determination in all respects including the damages award. The trial court further held that inasmuch as the Commission's order mandated no "affirmative action" be taken by Bell to assure future compliance with the Civil Rights Law, but payment of damages only, that the collective bargaining agreement was not disturbed, and the claim for injunctive relief was not warranted.

From the trial court's judgment, Bell appeals.

We reverse.

### "STATEMENT OF THE FACTS

The Findings of Fact and Conclusions of Law as determined by the hearing officer and adopted by the Commission are as follows:

### FINDINGS OF FACT

1. The complaint filed by the complainant alleges that the respondent was guilty of a discriminatory act on the basis of race on July 21, 1972.

2. On the date of the alleged act of discrimination the complainant was employed as a switchman by the respondent in a work group referred to as the 101 ESS group.

3. The complainant was a number 2 person on the seniority list in the work group.

4. In this work group the supervisor prepares a work schedule for each four week period. The work schedule lists the shifts which the supervisor offers for the upcoming four week period. The switchman [sic] in the group then bid on the offered shifts in order of seniority. The person with the greatest seniority bids his choice of the offered schedules, the second person on the seniority list bids his choice from the remaining shifts and so on down the seniority list until all offered tours of duty are bid.

5. Switchman [sic] employed by the respondent are paid premium pay for working night shifts and for working Sunday. A switchman working four or five nights in one week is paid a differential equal to 10% of his weekly pay. A switchman working nights and also on Sunday receives a pay differential of 20% of his weekly pay.

6. On the work schedule offered by the supervisor for the period of July 2, 1972 to July 29, 1972, (Complainant's exhibit 1) the supervisor Barton offered a shift which worked from 4 p. m. until 12 midnight, Sunday through Thursday. The switchman who bid this shift would receive the premium pay for nights and the premium pay for Sunday. On this work schedule this shift was bid by John Matlock, the senior man in the work group. Matlock ordinarily worked day shifts but for this particular work schedule he bid this particular shift because of the greater pay and because he would be on vacation one week during the work schedule.

7. On the following work schedule, July 30, 1972 to August 26, 1972, (Complainant's exhibit 3 and Respondent's exhibit B) the 4 p. m. to 12 a. m., Sunday through Thursday shift was not offered. The schedule was changed so that the 4 p. m. to midnight tour on Sunday was added to a shift which otherwise worked from an 8 a. m. to 5 p. m. shift. This is the shift which was bid by T. Clidence on Complainant's exhibit 3.

8. On the July 30 to August 26, 1972 work schedule, Matlock bid a 7 a. m. to 4 p. m. shift.

9. If the supervisor Barton had offered the 4 p. m. to 12 midnight, Sunday through Thursday on the July 30, 1972 to August 26, 1972, work schedule as he had done the previous month and if John Matlock had bid the day shift anyway the complainant George Luddington could have bid the double premium 4 p. m. to midnight, Sunday through Thursday shift. This would have given the complainant the Sunday premium in addition to the night premium which he was able to bid anyway.

10. The complainant's position is that the supervisor Barton knew that Matlock would bid the day shift and took the Sunday 4 p. m. to midnight off the night shift and put it with another day shift in order to deprive Luddington of the Sunday premium pay. This is the alleged act of discrimination which is the basis of the complaint.

11. The supervisor Mr. Chuck Barton testified that he split the schedule in the manner he did on the July 30, 1972 to August 26, 1972, schedule in order to more equally distribute the premium pay among the five men in the group. This arrangement meant that there were four shifts available which included premium pay equal to 10% and no shifts available which included premium pay equal to 20%. If a 4 p. m. to midnight, Sunday through Thursday shift were offered on this work schedule there would have been one shift that offered 20% premium and two additional shifts which offered 10% premium pay.

12. The scheduling technique of offering a Sunday 4 p. m. to 12 midnight along with four day shifts in one weekly schedule was used only during August and September of 1972 and is not a practice which is commonly used by the respondent's supervisors. The only other time the supervisor Barton could remember using this technique was for one week on the schedule January 14, 1973 to February 10, 1973, (Complainant's exhibit 5),

and one week on the 8th day of April, 1973 to May 5, 1973 schedule (Complainant's exhibit 6).

13. There is no direct evidence that the supervisor Barton or any other agent or employee of the respondent acted with an intention to discriminate against the complainant on account of his race.

14. The effect of the supervisor's decision to not offer the 4 p. m. to 12 midnight Sunday through Thursday shift was to deprive the complainant Luddington, the only black in the work group, of the 10% premium pay for Sunday and make that premium available to a white switchman.

## CONCLUSIONS OF LAW

1. The complainant has not shown by a preponderance of the evidence that the supervisor Barton or any other agent or employee of the respondent intended to discriminate against him on the basis of race.

2. The effect of the supervisor Barton's action in splitting the premium time was to make the Sunday premium available to a white switchman at the expense of the complainant Luddington, a black. Since the splitting of premium time is not a common practice, the discriminatory effect renders its usage in this case a discriminatory act contrary to the Indiana Civil Rights Act. Accordingly, the respondent is guilty of a discriminatory act."

The hearing office recommended damages equal to 10% of Luddington's pay for a period of the seven weeks commencing July 2, 1972 through August 20, 1972, plus interest from September 1, 1972. The Commission modified the damages award to include compensation based on five weeks, rather than the seven weeks recommended by the hearing officer.

## ISSUES

Bell presents three issues for review as follows:

I.  Whether the Commission may find a violation of the Indiana Civil Rights Law where the Commission has adopted a finding of no intentional discrimination and where there is no finding of any discriminatory pattern or practice;

II.  Whether the trial court adopted an incorrect standard of review in requiring Bell to prove by undisputed and uncontradicted evidence that discrimination did not occur;

III.  Whether the Commission may invalidate an agreement between a collective bargaining agent and the employer as to competitive bidding for work schedules, without making any finding as to the discriminatory effect of such collective bargaining agreement.

Because our resolution of Issue I is dispositive of this cause, we have no occasion to address Issues II and III.

### DISCUSSION AND DECISION

Bell asserts error in the Commission's determination, upheld by the trial court on judicial review, that a Civil Rights Law violation had occurred despite the express finding by the Commission of no intentional discrimination and absent a finding of a discriminatory "pattern or practice." The Commission maintains it need not find an "intent to discriminate" was proven by a preponderance of the evidence before the "effect" of a discriminatory practice can be redressed.

In the judgment affirming the determination of the Commission, the trial court entered, *inter alia*, the following:

### "FINDINGS OF FACT

\*　　\*　　\*　　\*　　\*　　\*

14. The Indiana Civil Rights Commission does not have to find that an 'intent to discriminate' was proven by a preponderance of the evidence before the 'effect' of a discriminatory practice can be redressed.

15. Testimonial admission, that a given practice produced a discriminatory 'effect', when combined with other evidence and the demeanor of the witness, and when viewed most favorable [sic] to the prevailing party said evidence is substantial, reliable and of probative value, it is sufficient to support the determination that a discriminatory practice had occurred and the 'effect' could be redressed.

\*　　\*　　\*　　\*　　\*　　\*

### CONCLUSIONS OF LAW

\*　　\*　　\*　　\*　　\*　　\*

3. The demeanor of a witness which is viewed by the trier of fact has substantial impact on the credibility of a witness and his testimony and should not therefore be dismissed lightly by a review court.

4. I.C. 4–22–1–18 and relevant case law (i. e. *Department of Financial Institutions v. State Bank of Lizton,* 253 Ind. 172, 252 N.E.2d 24B [sic] at 251 (1969) and following cases) require Petitioner to possess undisputed and uncontradicted evidence that a discriminatory practice did not occur and that a discriminatory effect did not result before this court can overturn respondents' determination.

\* \* \*"

The Commission had determined, in its Conclusion of Law, number 1, that Luddington had not shown by a preponderance of the evidence Bell intended to discriminate against him on the basis of race.

The public policy recognized by the legislature in enacting the Indiana Civil Rights Law, Ind. Code 22–9–1–1 through 22–9–1–13, as it relates to matters touching upon employment, is stated in Ind. Code 22–9–1–2 as follows:

"(a) It is the public policy of the state of Indiana to provide all of its citizens equal opportunity for ... employment.... Equal education and employment opportunities ... are hereby declared to be civil rights.

(b) The practice of denying these rights to properly qualified persons by reason of the race, religion, color, sex, handicap, national origin or ancestry of

such person is contrary to the principles of freedom and equality of opportunity and is a burden to the objectives of the public policy of this state and shall be considered as discriminatory practices. The promotion of equal opportunity without regard to race, religion, color, sex, handicap, national origin or ancestry through reasonable methods is the purpose of this chapter.

(c) It is also the public policy of this state to protect employers ... from unfounded charges of discrimination.

\* \* \* \* \* \*

(e) This chapter shall be construed broadly to effectuate its purpose."

A "discriminatory practice" is defined in Ind. Code 22–9–1–3(*l*), which states in part:

"(e) The term 'discriminatory practice' means the exclusion of a person, from equal opportunities because of race, religion, color, sex, handicap, national origin or ancestry; or a system which includes persons from equal opportunities because of race, religion, color, sex, handicap, natural [sic] origin or ancestry [.] ... Every discriminatory practice relating to ... employment ... shall be considered unlawful unless it is specifically exempted by this chapter."

The procedures for the filing, investigation, hearing, resolution, and redress of complaints of alleged discriminatory practices, not here in issue, are prescribed by the Civil Rights Law. Ind. Code 22–9–1–3(*o*); 22–9–1–6; 22–9–1–11. The remedies authorized for the redress of discriminatory practices include issuing cease and desist orders, requiring affirmative action to assure compliance with the law, and awarding damages limited to the complainant's loss of wages, salaries, and commissions attributable to the discriminatory practice. Ind. Code 22–9–1–6(k)(1). Judicial review of the Commission's actions is to be undertaken according to the applicable provisions of the Administrative Adjudication Act (Ind. Code 4–22–1). Ind. Code 22–9–1–6(k)(2).

Our task, then, is to consider whether the evidence found by the Commission is suffi-cient to support the legal inference drawn therefrom that Bell engaged in an unlawful "discriminatory practice" as that term is to be understood under the Civil Rights Law. It is only upon such a determination by the Commission that it is authorized to impose its remedial powers. Ind. Code 22–9–1–6(k)(1) states in part that the Commission has, among others, the power and duty:

"To state its findings of fact after a hearing and, if the commission finds a person has engaged in an unlawful discriminatory practice, it may cause to be served upon such person an order requiring such person to cease and desist from the unlawful discriminatory practice and requiring such person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power to restore complainant's losses incurred as a result of discriminatory treatment as the commission may deem necessary to assure justice. ..."

On its face, the Civil Rights Law appears to require that some degree of discriminatory motive on the part of the employer must accompany the act complained of in order for such to constitute an unlawful discriminatory practice, and thus, be actionable. The definition of "discriminatory practice" in Ind. Code 22–9–1–3(*l*), *supra*, states in part,

"The term 'discriminatory practice' means the exclusion of a person, from equal opportunities *because of* race ...." (Our emphasis)

The corresponding provision of the federal Civil Rights Act of 1964, Title VII, § 703(a), 42 U.S.C.A. § 2000e–2(a) states:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's race, color, religion, sex, or national origin." (Our emphasis)

Our state and federal statutes are similar in the respect that each contain the "because of" modifier concerning what actions by employers constitute actionable discrimination. While federal decisions construing the federal Act are not binding upon this court, we will give them careful consideration in construing similar state statutes. Indeed, we have looked to federal decisions for interpretational guidance in the area of civil rights. *See, e. g., Indiana Civil Rights Commission v. Sutherland Lumber*, (1979) Ind.App., 394 N.E.2d 949. Since the legislature has expressed its desire that the Law be broadly construed, Ind. Code 22–9–1–2(c), *supra*, we shall consider the gloss given the Civil Rights Act of 1964 by the federal bench.

The Commission in its brief has cited but one case, a federal one, in support of its position on this issue, *Griggs v. Duke Power Company*, (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, and that for the shallow proposition that, "there are certain instances in which the effect can be discriminatory even if there is no discriminatory intent." *Griggs* is a leading case in the area of employment discrimination under the federal Civil Rights Act of 1964, and is extremely helpful in our analysis.

The issue before the Supreme Court in *Griggs* was stated to be,

"Whether an employer is prohibited by the Civil Rights Act of 1964, Title VII, from requiring a high school education or passing of a standardized general intelligence test as a condition of employment in or transfer to jobs when (a) neither standard is shown to be significantly related to successful job performance, (b) both requirements operate to disqualify Negroes at a substantially higher rate

than white applicants, and (c) the jobs in question formerly had been filled only by white employees as part of a longstanding practice of giving preference to whites."

401 U.S. at 425–26, 91 S.Ct. at 850–51.

The United States Court of Appeals for the Fourth Circuit had found the practice not to be violative of the federal Act since there was no showing of a discriminatory purpose in the adoption of those requirements by the employer, and held that the subjective intent of the employer was to be determinative of whether a discriminatory act had occurred. The Supreme Court reversed, stating in summation,

"In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

. . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

\*　　\*　　\*　　\*　　\*　　\*

The Court of Appeals held that the Company had adopted the diploma and test requirements without any 'intention to discriminate against Negro employees.' [*Griggs v. Duke Power Co.*] 420 F.2d, [1225] at 1232. We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds'

for minority groups and are unrelated to measuring job capability."

401 U.S. at 430–32, 91 S.Ct. at 853–54. *Griggs* thus differs substantially from the case at bar in the manner of discrimination considered as well as the attendant legal issues addressed.

Actions by employers that have been found to constitute violations of employment discrimination may be classified according to two types. These have been characterized by the Supreme Court as follows:

> " 'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See *e. g., Arlington Heights v. Metropolitan Dev. Corp.,* 429 U.S. 252, 265–266, 97 S.Ct. 555, 563–565, 50 L.Ed.2d 450. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, *e. g.,* 110 Cong.Rec. 13088 (1964) [remarks of Senator Humphrey omitted].
>
> Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Compare, *e. g., Griggs v. Duke Power Co.,* 401 U.S. 430–432, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158, with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668. See generally B. Schlei & P. Grossman, Employment Discrimination Law 1–12 (1976); Blumroses, Strangers in Paradise: *Griggs v. Duke Power Co.* and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972). Either theory may, of course, be applied to a particular set of facts."

*International Brotherhood of Teamsters v. United States,* (1977) 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (n. 15).

Clearly, *Griggs* was a case alleging disparate impact; the mere existence of the facially neutral requirements, unjustified by a satisfactory business necessity, which operated to treat the class of black applicants and employees differently than the class of white applicants and employees, constituted actionable employment discrimination, and no consideration of the employer's motive in implementing the system was relevant to the determination. Thus, the Supreme Court, in *Griggs,* has determined that an "unlawful employment practice," which by statutory definition requires a finding of discrimination "because of" race, etc., may be established without considering the employer's motive in undertaking the practice in a "disparate impact" situation.

■ Conversely, when a theory of "disparate treatment" is alleged, i. e., the claimant alleges he was treated in some way differently than another similarly situated employee because of his race or other attribute, the motive behind such treatment is highly significant, and dispositive. *See e. g., Ekanem v. Health & Hospital Corporation of Marion County,* (7th Cir. 1978) 589 F.2d 316; *Barnes v. St. Catherine's Hospital,* (7th Cir. 1977) 563 F.2d 324; *Frockt v. Olin Corporation,* (S.D.Ind.1972) 344 F.Supp. 369.

■ We have closely examined the materials compromising the record of this cause. While Luddington's complaint is not characterized precisely as a "disparate treatment" case, our analysis of the facts alleged and adduced at the hearing reveals it to be just that. He nowhere complains that the bidding system itself operates to work an invidious impact upon the class of black switchmen. He attempts to prove that one, isolated action on the part of his supervisor produced upon him an "effect" that was discriminatory. That "effect" was to make the Sunday premium shift available to another switchman who, because of the racial composition of the work group, is white, and to therefore make the shift unavailable

to Luddington, who is black. For such a claim to be cognizable, it must be that Luddington was treated differently than the other employee *because of* his race. It follows that the motivation to so discriminate on the part of the supervisor must be shown. The conclusion by the Commission that the "intent to discriminate" was not shown by a preponderance of the evidence—a finding of basic fact which we are compelled upon review to accept—establishes that the critical element of motive is not present in this case. We hold, therefore, that the conduct complained of fails, as a matter of law, to establish an unlawful discriminatory practice under the Indiana Civil Right Law.

We recognize that the construction accorded a statute by the administrative agency charged with its implementation is to be given considerable deference by the courts. *Aaron v. Review Board of the Employment Security Division of Indiana,* (1981) Ind.App., 416 N.E.2d 125. We may not, however, defer to an erroneous interpretation. Further, we do not think that the intent of the legislature would be fostered by upholding the Commission's determination upon the facts of this case. For a redressible discriminatory practice to occur, there must be something more than a disappointment borne by an employee who happens to fit the characteristics of a protected classification.

This cause is therefore reversed and remanded to the trial court with instructions to proceed in a manner not inconsistent with this opinion.

Reversed.

ROBERTSON, J., and YOUNG, P. J. (participating by designation), concur.