**INDIANA DEPARTMENT OF NATURAL RESOURCES, LAW ENFORCEMENT DIVISION, Appellant–Respondent,**

v.

**Donnita L. COBB, Appellee–Complainant.**

No. 93A02–0410–EX–869.

Court of Appeals of Indiana.

Aug. 11, 2005.

Rehearing Denied Oct. 7, 2005.

Steve Carter, Attorney General of Indiana, Maureen Bartolo, Deputy Attorney General, Indianapolis, for Appellant.

Robin Clay, Staff Counsel, Indiana Civil Right Commission, Indianapolis, for Appellee.

## OPINION

BAKER, Judge.

Appellant-respondent Indiana Department of Natural Resources, Law Enforcement Division (DNR) appeals from the determination of the Indiana Civil Rights Commission (ICRC) that DNR terminated appellee-complainant Donnita L. Cobb on the basis of gender discrimination. Specifically, DNR contends that ICRC erred in finding for Cobb because she failed to make a prima facie case of discrimination, and that even if she did make such a case, she failed to show that DNR's legitimate reasons for termination were mere pretext.

Finding that there is not substantial evidence to support the ICRC's determination that Cobb made a prima facie case of discrimination, we reverse the judgment of the ICRC.

## FACTS [1]

DNR hired Cobb as a probationary conservation officer on November 20, 1995, after Cobb successfully completed DNR's conservation recruit school. Upon suc-

---

1. Oral argument in this case was held on June 15, 2005, in Indianapolis, Indiana. We com- mend counsel for their outstanding oral and written presentations on this matter.

cessfully completing a course at the Indiana Law Enforcement Academy, Cobb was assigned to DNR's District 6. Cobb's direct supervisor was Sergeant Beth Hauer. Also supervising Cobb was Sergeant Hauer's supervisor, Lieutenant Dennis Koontz. All conservation officers were subject to a one-year probationary period.

Beginning on March 30, 1996, Hauer began documenting a series of infractions committed by Cobb:

- On March 30, 1996, Cobb failed to submit a form designating her next of kin as ordered by Hauer. Cobb says that she did not turn in the form because she did not have a permanent address at that time. Hauer requested that Cobb complete and turn in this form more than once verbally, finally submitting a written order on April 9, 1996. Appellant's App. p. 92.
- In April 1996, Cobb notified Hauer that her DNR-issued boots did not fit properly. Hauer ordered Cobb to exchange her boots, but instead of doing so Cobb chose to wear the original boots at home to break them in. *Id.* at 93.
- On April 30, 1996, Cobb and another officer were late for a training session. After arriving late, Cobb went to the restroom and stayed there for more than five minutes prior to entering the classroom. *Id.*
- In May 1996, Cobb arrived late to a scheduled program because she got lost. Cobb says that she received incorrect directions from another officer. *Id.*
- On May 9, 1996, Hauer issued a letter of consultation to Cobb regarding her concern that Cobb was not listening well. *Id.*
- In July 1996, Cobb's radio began to malfunction. By September 1996, the problem had not been resolved, and Hauer ordered her to have her radio fixed, advising Cobb that Hauer would acquire a replacement radio for her. Cobb did not have it fixed because she did not believe she had authorization. In October 1996, the radio was still malfunctioning. Hauer again ordered Cobb to have it fixed as soon as possible, specifically ordering her to leave early that day to do so. As Cobb was leaving, however, she encountered a journalist who requested an interview and tour of the park, which Cobb agreed to do. Consequently, she arrived at the radio repair shop after closing. The following morning, she arrived at the repair shop and was told that the radio would not be sent out until the following Monday. Although Hauer had acquired a replacement radio for Cobb's use, Cobb kept her radio over the weekend because she believed that having her own radio—although only one channel was working—was superior to borrowing a radio and leaving another officer without a radio for a two-hour period over the weekend. *Id.* at 102–03.
- On more than one occasion, Cobb was late for meetings with other officers. *Id.* at 124, 126.
- On July 18, 1996, Cobb was late to a commission meeting she was responsible for attending. *Id.* at 150.
- In May 1996, Cobb was late to arrive for her shift and forgot to bring a flashlight as required. *Id.* at 116–17.
- Also in May 1996, Cobb was ordered to procure a gun belt and failed to do so in a timely fashion. *Id.* at 126.
- In May 1996, it was noted that Cobb lacked ambition and enthusiasm with respect to field duties. *Id.* at 116–17.

In Hauer's final letter in which she recommends that Cobb's probationary period be

extended, she reported the following problems for the first time:

- Hauer notes that when Cobb is instructed to do something, she "just doesn't do it, fabricates the truth as to why, or voices a haughtily spoken resistance." *Id.* at 152.
- On August 26, 1996, Hauer asked Cobb to gather information on Marion County's Juvenile Lock–Up. Cobb "interrupted and haughtily stated that this didn't need to be done . . . ." *Id.*
- In September 1996, Cobb agreed to help with certain things that needed to be done as a result of the Indianapolis marathon. She failed to fulfill those duties. *Id.* at 152–53.
- Hauer received reports from other officers that they don't like to be around Cobb and avoid her when possible. *Id.* at 154.
- Other officers reported to Hauer that they had difficulty reaching Cobb by radio and that Cobb often interrupted while being given instructions. *Id.*

The only one of Cobb's peers to have remotely the same number of problematic instances and character traits was David Dungan. Dungan also reported directly to Hauer until December 1996, when he was transferred to another district because he had moved. During the time Hauer was Dungan's supervisor, she noted the following incidents:

- In August 1996, Dungan failed to repair hail damage to his car as he had been ordered to do. *Id.* at 109.
- Also in August 1996, Dungan drove too many miles for the month. *Id.*
- In September 1996, Dungan was late to turn in his monthly paperwork. The postmark on the paperwork revealed that he had put it in the mail after it was due, but Hauer chose "to think that the post office was in error

on his reports rather than the officer not telling the truth." *Id.* at 110.

- In September 1996, Hauer noted that Dungan does not take responsibility for his actions, and she recommended that he be closely monitored. *Id.*
- On November 21, 1996, Dungan was involved in a physical altercation with another probationary officer in the cafeteria. *Id.* at 108.

After Dungan was reassigned to another district, his direct supervisors noted the following incidents and problems:

- Dungan "tends to talk a lot" and "should concentrate more on becoming a better listener." *Id.* at 111.
- Dungan is "too confident," does not listen to all of the older officers, and tends to interrupt people who are informing him of something to tell them that "he already knew how to do that." *Id.* at 112.
- Dungan spread rumors about another employee. *Id.*
- Dungan needs to "spend more time listening to instruction and less time bragging about his knowledge." *Id.* at 113.

There are several other probationary officers who had one or two reported incidents, but only Dungan and Cobb had a lengthy list of problems.

On October 31, 1996, Hauer recommended that Cobb's probationary period be extended based upon the above pattern of behavior. Lieutenant Koontz recommended that Cobb be terminated because, in his opinion, extending her probation would have merely prolonged the problem. On November 13, 1996, Cobb was terminated.

On February 21, 1997, Cobb filed a complaint of discrimination with ICRC, alleging that DNR had treated her unfairly because she is a woman. On April 6, 2003,

a hearing was held before an Administrative Law Judge (ALJ). On May 7, 2003, the ALJ filed his proposed findings of fact, conclusions of law, and order, in which he determined that it is more likely than not that the reasons asserted for Cobb's termination are mere pretext for gender-based discrimination, awarding damages and interest to Cobb in the amount of $17,388.91. The ALJ also ordered DNR to require its law enforcement employees to attend a seminar on discrimination and to notify the ICRC of all women employed in the law enforcement divisions on an annual basis. After oral argument and submission of briefs, on August 20, 2004, the ICRC adopted the ALJ's findings of fact, conclusions of law, and order. DNR now appeals.

### DISCUSSION AND DECISION

DNR contends that the ICRC erred in concluding that the reasons it asserted for terminating Cobb are mere pretext for gender-based discrimination. In particular, DNR argues that Cobb failed to make a prima facie case of gender discrimination, that DNR articulated legitimate nondiscriminatory reasons for Cobb's termination, and that Cobb failed to meet her burden of proving that the reasons given for her termination were mere pretext for gender discrimination.

### I. Standard of Review

As we consider these arguments, we note that we have jurisdiction to review the ICRC's final decisions directly. Ind. Appellate Rule 5(C). We may grant relief to a party only if we determine that the party has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind.Code § 4-21.5-5-14(d).

 We may not substitute our judgment on factual matters for that of the agency and are bound by the agency's findings of fact if they are supported by substantial evidence. *Weatherbee v. Ind. Civil Rights Comm'n*, 665 N.E.2d 945, 947 (Ind.Ct.App.1996), *trans. denied*. We are not bound, however, by the agency's conclusions of law. *Id.* Moreover, an agency's findings of ultimate fact—factual conclusions derived from basic facts—are subject to a reasonableness standard of review. *Id.* Whether the ultimate fact of discrimination was a reasonable inference from the basic facts is a question of law properly subject to our scrutiny. *Id.*

### II. Prima Facie Case

 Cobb's complaint is based upon a theory of disparate treatment. Disparate treatment occurs when an employer treats a person or group of people less favorably than others because of their gender. *Weatherbee*, 665 N.E.2d at 951. When disparate treatment is alleged, the motive behind such treatment is highly significant and dispositive. *Id.*

 When disparate treatment is alleged, Indiana has adopted the allocation of burdens and order of presentation of proof outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Weatherbee*, 665 N.E.2d at 951. Accordingly, first, the complainant must prove a prima facie case of discrimination. *Id.* If the complainant fulfills this requirement, the burden then shifts to the respondent to articulate a legitimate, nondiscriminatory reason for the employee's rejection. *Id.* Should the respondent carry this burden,

it is then incumbent upon the complainant to prove by a preponderance of the evidence that the legitimate reasons offered by the respondent were but a pretext for discrimination. *Id.* The ultimate burden of showing that the respondent engaged in unlawful discrimination, however, remains at all times with the complainant. *Id.*

■ The Indiana Administrative Code contains a nondiscrimination provision that regulates the DNR's practices:

No applicant for a position as an employee, and no employee, shall be discriminated against or favored with respect to the following:

(1) Hiring.

(2) Promotion.

(3) Demotion.

(4) Termination.

(5) Tenure.

(6) Terms.

(7) Conditions.

(8) Privileges of employment or any matter directly or indirectly related to employment because of one (1) of the following:

(A) Race.

(B) Color.

(C) Sex.

(D) Religion.

(E) National origin.

(F) Ancestry.

312 IAC 4–5–1. According to the Indiana Code, a "discriminatory practice" is "the exclusion of a person from equal opportunities because of ... sex ...; every discriminatory practice relating to the acquisition of employment ... shall be considered unlawful unless it is specifically exempted by this chapter." Ind.Code § 22–9–1–3(1). This statute has been construed consistently with the Federal Civil Rights Act of 1964, Title VII, § 703(a), 42 U.S.C. § 2000e–2(a), and al-

though federal decisions are not binding upon this court, federal decisions are helpful in construing Indiana's Civil Rights Act. *Ind. Civil Rights Comm'n v. City of Muncie*, 459 N.E.2d 411, 418 (Ind.Ct.App.1984).

■ To meet her burden of establishing a prima facie case of gender discrimination, Cobb had to show that: (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. *Thayer v. Vaughan*, 798 N.E.2d 249, 253 (Ind.Ct.App.2003), *trans. denied.* If the complainant does not establish all four elements, her claim fails as a matter of law. *Id.* In this case, only elements two and four are at issue.

As to the second element, DNR argues that Cobb failed to prove that she was meeting DNR's legitimate job expectations given the lengthy list of problems and incidents surrounding her behavior on the job. According to DNR, the volume and content of complaints about Cobb's performance demonstrated a failure to follow orders, and in a law enforcement setting such as this one, insubordination in any form need not be tolerated.

Cobb responds by contending that she need not prove that she was meeting DNR's legitimate job expectations because her primary argument is that her classmates—male probationary officers—were committing similar infractions but were not punished as harshly or monitored as closely as she was.

■ Under certain circumstances, a plaintiff need not demonstrate that she was actually meeting her employer's legitimate expectations where she alleges that

other employees were also failing to meet the employer's legitimate expectations but were not disciplined or were not disciplined as harshly as she was; in other words, that "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992). To successfully make such a claim, the plaintiff must show that she is similarly situated with respect to performance, qualifications, and conduct. *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000). Making this argument "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617–18.

In this case, the record reveals that only one other probationary officer—Dungan—had a list of infractions that even remotely approaches the volume of complaints about Cobb. But nearly half of the incidents occurred when Dungan was no longer being supervised by Hauer. We again refer to *Radue:*

> Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently. These distinctions sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination.

*Id.* at 618. Accordingly, without more evidence, the incidents that occurred after Dungan was supervised by someone other than Hauer are not probative of whether he was similarly situated to Cobb.

During the time that Dungan was supervised by Hauer, she reported five problems with his behavior on the job. During Cobb's tenure under Hauer, there were at least sixteen noted difficulties. Cobb complains that while she received frequent official reprimands for her behavior, Dungan's—and the other male officers'—incidents were only noted briefly in monthly reviews. Even if we were to give Cobb the benefit of the doubt and cause all five incidents in the record to be elevated to punishable offenses, she would still have sixteen to his five. The record does not show any other infractions committed by Dungan that his supervisors failed to report. Given this record, we simply cannot find evidence to support Cobb's assertions that she had any similarly situated peers who were punished less severely than she was.

Given that conclusion, to make a prima facie case of disparate treatment, Cobb must show that she was meeting her employer's legitimate expectations. When her employment is viewed as a whole, it is apparent to us that Cobb displayed a pattern of insubordination, reluctance to follow orders, and a lack of respect for her superiors evidenced by a haughty tone. That Cobb has an explanation for her behavior during many of the incidents is of no moment inasmuch as she was working in a law enforcement setting in which it was incumbent upon her to follow orders diligently. *See Natural Resources Comm'n of DNR v. Sullivan*, 428 N.E.2d 92, 103 (Ind.Ct.App.1981) (evidence supported demotion of employee of law enforcement division where employee refused to obey direct orders); *State ex rel. Myers v. Chiaramonte*, 46 Ohio St.2d 230, 348 N.E.2d 323, 329 (1976) (noting that "discipline and the necessity for [State Highway] patrolmen to respond immediately and affirmatively to orders of superior officers is essential to the maintenance

of the patrol as an effective law enforcement organization").

We also note that DNR—Cobb's employer—was in the best position to observe her general demeanor and tone on a regular basis, and we are not in a position to gauge the subtleties of an employee's daily behavior. In other words, we do not sit as a "super-personnel department that re-examines an entity's business decisions." *Thayer*, 798 N.E.2d at 255. Given the record before us, there is insufficient evidence to support the ICRC's conclusion that Cobb met her prima facie case of discrimination. She was unable to show that she was treated more harshly than similarly situated male employees, and was also unable to show that she met her employer's legitimate expectations. Consequently, we conclude that the ICRC's determination was not supported by substantial evidence and as a result, its decision in favor of Cobb was improper.

The judgment of the ICRC is reversed.

BAILEY, J., and ROBB, J., concur.