FILTER SPECIALISTS, INC., Appellant–Petitioner,

v.

Dawn BROOKS and Charmaine Weathers, Appellees– Respondents,

and

Michigan City Human Rights Commission, Appellee– Intervenor.

No. 46A05–0704–CV–203.

Court of Appeals of Indiana.

Dec. 28, 2007.

Rehearing Denied March 26, 2008.

Timothy W. Woods, Jones Obenchain, LLP, Attorney for Appellant.

Shaw R. Friedman, Friedman & Associates, P.C., LaPorte, IN, Attorney for Appellees Dawn Brooks and Charmaine Weathers.

Lawrence W. Arness, Michigan City, IN, Attorney for Appellee Michigan City Human Rights Commission.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

Filter Specialists, Inc., appeals from the trial court's order affirming the decision of the Michigan City Human Rights Commission (the "Commission"), which found Filter took adverse employment action against two employees, Dawn Brooks and Charmaine Weathers (referred to collectively as the "Employees"), based on their race.[1] Filter raises five issues, which we restate as: (1) whether Filter was subject to the Commission's jurisdiction; (2) whether the Commission's decision cannot stand based on the Employees' failure to introduce the local ordinance proscribing racial discrimination by employers; (3) whether the trial court abused its discretion in granting the Commission's motion to be joined as a party; (4) whether sufficient evidence supports the Commission's decision; and (5) whether the evidence supports the Commission's award of back pay. We conclude Filter has waived its jurisdictional argument, the Employee's failure to introduce the applicable ordinance is not fatal, and the trial court properly joined the Commission as a party. However, concluding the Commission's decision was not supported by sufficient evidence, we reverse.[2]

*Facts and Procedural History*

On March 5, 2003, the Employees arrived at Filter at approximately 7:00 a.m., the time their shift began. Weathers, who was driving, stopped her car near one of the facility's entrances ("Entrance 1") and

1. Both Employees are African–American.

2. We therefore do not reach Filter's argument regarding the award of back pay.

dropped off Brooks. Weathers then parked her car and proceeded into the facility via a different entrance ("Entrance 2"). Diana Wirtz, Filter's human resources manager, arrived at roughly the same time as the Employees and observed their arrival. Wirtz watched Weathers exit her car, walk toward Entrance 2, and pass two other Filter employees, James Cazy and LeRoy Shark, who were leaving the facility after finishing their shift. At the same time, Wirtz saw Eric Gordon, another Filter employee, exit the facility. Wirtz then entered the facility through Entrance 1 and waited by the time clock for Weathers, whom Wirtz testified did not arrive. At this point, Wirtz became suspicious, and checked Filter's time clock records.

Filter's facility has two time clocks. One time clock ("Time Clock 1") is located near Entrance 1. The other ("Time Clock 2") is located near Entrance 2. Employees clock in by entering their employee number followed by the "enter" key. The clocks run on a sixty-second cycle, so employees' clock-in times are shown in hours and minutes, but not seconds.

Filter's records indicate that Brooks and Weathers both clocked in at 7:01 a.m. on Time Clock 1, that Cazy and Shark had clocked out at 7:00 a.m., and that Gordon had clocked out at 7:01 am. Based on her observations and the time clock records, Wirtz determined that Brooks had clocked in Weathers. Such action is a violation of Filter's conduct policy and, according to Filter's handbook, requires either a suspension or termination. Wirtz notified Mike Forbes, Filter's production manager and the Employees' supervisor, that the Employees had violated Filter's time clock

rule and recommended that the Employees be terminated. Forbes did not want to terminate the Employees, as he believed they were both good workers. Wirtz and Forbes took the matter to Bernie Faulkner, Filter's COO. After discussing the matter, the three decided not to terminate the Employees if they signed a "last chance agreement," in which they would admit the violation.

Wirtz and Forbes met with the Employees separately and presented each of them with the "last chance agreement." Both Employees refused to sign the agreement and denied violating the timecard policy. Weathers claimed that she clocked herself in at Time Clock 1 at 7:01 a.m., and that she did not see Wirtz when she clocked in. She claimed that she entered the facility through Entrance 2, and then ran to Time Clock 1 to clock in. Brooks denied entering Weathers's employee number. Forbes then terminated both Employees.

The Employees filed a complaint alleging employment discrimination with the Commission, which held a hearing on April 20, 2005. On August 18, 2005, the Commission entered its decision, finding that Filter had discriminated against the Employees based on their race. Along with its decision, the Commission entered the following relevant conclusions: [3]

3. The Claimants in this case have met the burden of proof to establish a prima facie case of racial discrimination. Both claimants are African American women, who, according to the supervisor, Mr. Forbes, were good employees that the company did not want to lose. The testimony provided during the hearing in this matter further demonstrates that other Caucasian employees of the com-

**3.** The Commission entered numerous purported findings of fact. As discussed, *infra,* section IV. B., the vast majority of these purported findings merely recite various wit-

nesses' testimony. As these "findings" are therefore not particularly useful, it is unnecessary to reproduce them here.

pany who engage in far more egregious behavior than that the Claimants were accused of received far less severe forms of discipline for their actions. In fact, Mr. Forbes testified that he did in fact have the choice of either suspending or terminated [sic] the Claimants in this matter, and he chose to terminate them. Finally, the Claimants have proven that the company did in fact take adverse employment action against them. . . .

4. In fact, as noted in Exhibits E and F to the hearing transcript in this case, the Michigan City Human Rights Department, following an investigation into the [C]laimants['] allegations of racial discrimination, did in fact find probable cause existed to support the Claimants['] charges, noting in their findings the lack of eyewitnesses to the alleged incident, the fact that the time clock records reflected other employees punching in at the same time on occasion and the lack of discipline for those employees.[ 4]

\* \* \*

### Conclusion

The testimony and evidence presented during the hearing clearly support the [C]laimants' position in this matter. The company has failed to provide sufficient evidence to support their termination of the claimants. The company itself admits that they have no witnesses who actually saw the alleged time clock incident, and also admits that with two time clocks in the facility, it is possible for more than one individual to have punched in at the same time, either utilizing the same time clock or separate clocks. [ 5] The company further admitted that neither of these employees had any history of fraud or misrepresentation during their tenure with the company, and in fact both adamantly denied this incident. In addition, neither claimant was in danger of being terminated due to point accumulation even had they both punched in late that day. [ 6] The company can offer no evidence or witnesses to support their [sic] position in this matter, and have completely failed to provide any legitimate, non-discriminatory reason for the Claimant's [sic] discharge. In fact, other employees received much less discipline for far greater offenses, including throwing tools at another employee and even walking off the job. Yet, the company chose to terminate the Claimants in this matter, for an alleged offense which no one witnessed and that the evidence fails to support, and which the Claimants' denied. It is clear from the evidence in this matter that the stated reasons by the company for termination were pretextual and it was in fact the Claimant's [sic] race which was the motivating factor behind their discharge.

Appellant's App. at 11–13. Filter filed a petition for review in the trial court. The Commission filed a motion to be joined as

---

4. None of the parties has submitted this report to this court. However, we point out that Filter did not discipline the Employees for clocking in at the same time. Filter disciplined the Employees based on its belief that Brooks clocked in Weathers. The fact that the records indicate the Employees clocked in at the same time was evidence of time card fraud, not the reason for discipline in and of itself.

5. We point out that Filter's records indicate not only that Brooks and Weathers clocked in at the same time, but also that they both used the same time clock. *See* Appellant's App. at 145–46. Weathers also testified that she clocked in using the same time clock as Brooks used.

6. We point out that neither employee was terminated for point accumulation, and instead were terminated for timecard fraud.

a party-defendant, and the trial granted this motion. After a hearing, the trial court affirmed the Commission's decision. Filter now appeals.

*Discussion and Decision*

## I. The Employees' Failure to Introduce the Local Ordinance

■ Filter argues that the Commission's decision cannot stand because the Employees did not introduce the Michigan City Human Rights Ordinance into evidence during the agency proceeding. Filter argues that this failure is fatal to the Employees' claim, as without the ordinance in evidence, the Employees failed to prove that Filter violated the ordinance's terms. In making this argument, Filter relies on caselaw holding that a court will not take judicial notice of a local ordinance, and that a party must instead introduce evidence of the ordinance's existence and content. *See Gonon v. State,* 579 N.E.2d 614, 614 (Ind.Ct.App.1991) ("It is well-settled law in Indiana that ordinances cannot be the subject of judicial notice."); *Maish v. Town of Schererville,* 486 N.E.2d 1, 1 (Ind.Ct.App.1985) ("In Indiana the courts may not take judicial notice of municipal ordinances. They are subject to proof."). However, the cases are no longer good law, as they were all decided before 1994, when our supreme court adopted Indiana Rule of Evidence 201(b), which indicates,

"[a] court may take judicial notice of ... ordinances of municipalities." *See also City of Crown Point v. Misty Woods Props., LLC,* 864 N.E.2d 1069, 1074 n. 2 (Ind.Ct.App.2007) (taking judicial notice of a municipal ordinance).

Filter recognizes this rule,[7] but argues that "[t]o prove an ordinance by judicial notice, it must be brought to the attention of the trier of fact during the hearing." Appellant's Br. at 13. This statement is incorrect for two reasons. First, the rule provides that a court may take judicial notice at any point, including on appeal. *See* Ind. Evid. Rule 201(f); *Journal–Gazette Co., Inc. v. Bandido's, Inc.,* 712 N.E.2d 446, 460 n. 20 (Ind.1999) (taking "judicial notice that the words 'rats' and 'rodents' are frequently used interchangeably"), *cert. denied,* 528 U.S. 1005, 120 S.Ct. 499, 145 L.Ed.2d 385 (1999); *Stewart v. State,* 688 N.E.2d 1254, 1258 (Ind.1997) (taking judicial notice of a Kentucky statute even though the matter was not discussed at trial). Second, the rule provides that "[a] court may take judicial notice, whether requested or not." Ind. Evid. Rule 201(c). Although no party has requested this court to take judicial notice of the ordinance,[8] we elect to use our discretion to do so at this time.[9] Because we take judicial notice of the ordinance, the

---

7. Neither the Commission nor the Employees cite this rule in its brief.

8. We note that had the Employees requested this court or the trial court to take judicial notice of the ordinance and supplied the ordinance, this court or the trial court would have been *required* to take judicial notice. *See* Ind. Evid. Rule 201(d).

9. We recognize Indiana Evidence Rule 201(e), which states:

A party is entitled, upon timely request, to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of

the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

We can think of no reason why taking judicial notice of the ordinance would be improper or cause Filter any unfair prejudice, as Filter was clearly aware of the ordinance and its terms. *See* Appellant's App. at 102 (Filter's attorney stating that his "reading of your ordinance indicates you only need five commissioners for this hearing"). Were we affirming the Commission's decision, Filter would be allowed to put forth a good faith argument regarding the impropriety of this court taking judicial notice in a petition for rehearing.

Employee's failure to introduce it is of no effect.

## II. The Commission's Jurisdiction

■ Filter argues that the Employees failed to prove Filter was subject to the Commission's jurisdiction, as "[t]here was no evidence introduced at the administrative hearing establishing that Filter is located within the territorial jurisdiction of Michigan City and that is a fatal omission as shown by a long line of controlling precedent." Appellant's Br. at 14. Filter argues that the trial court therefore should have reversed the Commission's decision. We disagree.

First, the cases cited by Filter are wholly distinguishable, as they all involve a party's failure to introduce evidence of location when such location was a critical and disputed fact going to the merits of a case, and not a claim of lack of jurisdiction. *See Town of Windfall City v. State ex rel. Wood,* 174 Ind. 311, 315, 92 N.E. 57, 58 (1910) (noting that the court was unable to take judicial notice of the exact location of a parcel of land in a suit involving a petition to disannex that land); *Grusenmeyer v. City of Logansport,* 76 Ind. 549, 552 (Ind.1881) (where the city of Logansport objected to a petition to incorporate the Town of Taberville on the basis that the territory described in the petition was part of Logansport, the court refused to take judicial notice of the fact that the territory was already incorporated into the city of Logansport); *Ritz v. Ind. and Ohio R.R., Inc.,* 632 N.E.2d 769, 774–75 (Ind.Ct.App. 1994) (refusing to take judicial notice of a canal's exact location in a suit to quiet title), *trans. denied; Halstead v. City of Brazil,* 83 Ind.App. 53, 56–57, 147 N.E. 629, 630 (1925) (in an action to enjoin the city from condemning a parcel of land, the

court refused to take judicial notice that the land was outside the city's limits); *Pittsburgh, C., C. & St. L. R.R. Co. v. Philpott,* 75 Ind.App. 59, 63, 127 N.E. 827, 828 (1920) (whether accident occurred on public or private grounds was determinative of whether the defendant owed the plaintiff a duty). Here, Filter does not seriously dispute its location, and has presented no evidence that it is not located in Michigan City and therefore not subject to the Commission's jurisdiction. *Cf. United States v. Piggie,* 622 F.2d 486, 488 (10th Cir.1980) (holding that trial court properly took judicial notice that a penitentiary was located within the territorial jurisdiction of United States and in the District of Kansas), *cert. denied,* 449 U.S. 863, 101 S.Ct. 169, 66 L.Ed.2d 80 (1980); *Munster v. Groce,* 829 N.E.2d 52, 57 (Ind.Ct.App.2005) ("The defendant ultimately bears the burden of proving lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint."). Indeed, the only evidence in the record regarding Filter's location indicates that it is located in Michigan City. *See* Appellant's App. at 177 (letter from Wirtz indicating that Filter's address is 100 Anchor Road, Michigan City, IN).[10]

Regardless of whether the Employees should have introduced evidence establishing Filter's location, Filter appeared at the hearing in front of the Commission without objection, and did not raise an issue as to the Commission's jurisdiction until the case was before the trial court. Therefore, Filter has waived the issue. *See State v. Carmel Healthcare Mgmt.,* 660 N.E.2d 1379, 1383 (Ind.Ct.App.1996), *trans. denied; cf. Hill v. Ramey,* 744 N.E.2d 509, 512 n. 7 (Ind.Ct.App.2001) ("A defendant

---

10. We note that some residences or businesses may have a particular city's address

without being located within that city's limits.

can waive the lack of personal jurisdiction and submit himself to the jurisdiction of the court if he responds or appears and does not contest the lack of jurisdiction.").

### III. The Commission as a Party

The Commission filed a petition for joinder with the trial court under Indiana Trial Rule 19, which states:

A person who is subject to service of process shall be joined as a party in the action if:

(1) in his absence complete relief cannot be accorded among those already parties; or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may:

(a) as a practical matter impair or impede his ability to protect that interest, or

(b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

We review a trial court's decision to grant a party's motion for joinder for an abuse of discretion. *Rollins Burdick Hunter of Utah, Inc., v. Bd. of Trustees of Ball State Univ.*, 665 N.E.2d 914, 920 (Ind.Ct.App. 1996).

The trial court granted the Commission's motion, stating that the Commission "should be joined as a party Defendant so that [it] may answer these allegations [that its decision was arbitrary, capricious, and an abuse of discretion]." Appellant's App. at 34. Filter argues that the trial court improperly granted the Commission's petition for joinder, as the Commission was "akin to a Trial Court," and "does not meet any of the criteria for standing." Appellant's Brief at 44.

We initially note that Filter has failed to explain how the Commission's joinder to this suit has caused Filter any prejudice, and has failed to request any relief based on the alleged improper joinder. It is clear that, even if the joinder was improper, dismissal of the suit is not the remedy. *See* Ind. Trial Rule 21(A) ("Misjoinder of parties is not a ground for dismissal of an action."); *McCoy v. Like*, 511 N.E.2d 501, 506–07 (Ind.Ct.App.1987), *trans. denied.* Instead, we would merely dismiss the Commission as a party and review the issues with regard to Filter and the Employees. *See Hackin v. Lockwood*, 361 F.2d 499, 501 (9th Cir.1966) ("[W]e see no reason that such improper joinder should prevent our review of the matter as to the proper parties."), *cert. denied*, 385 U.S. 960, 87 S.Ct. 396, 17 L.Ed.2d 305 (1966). Despite Filter's inability to identify any prejudice it suffered as a result of the joinder, we will address the merits to clarify that in cases such as this, local civil rights commissions are proper parties in the trial court and on appeal.

Indiana statute permits any city, town, or county to adopt an ordinance establishing a commission to advance Indiana's public policy of providing Indiana citizens with equal employment opportunity without regard to their race, religion, color, sex, disability, national origin, or ancestry. *See* Ind.Code §§ 22–9–1–2, –12.1(b). These local commissions are specifically granted the power to order payment of damages caused by discriminatory practices and to "institute actions for appropriate legal or equitable relief in a circuit or superior court." Ind.Code § 22–9–1–12.1(c)(8), (9). "A decision of the local agency may be appealed under the terms of Ind.Code 4–21.5 the same as if it was a decision of a state agency." Ind.Code § 22–9–1–12.1(e). Therefore, statutes and caselaw relevant to the party-status of the Indiana Civil Rights Commission (the

"ICRC") are equally applicable to the propriety of the Commission's party-status.

Chapter 4–21.5–5 deals with judicial review of an agency action. Under this chapter, venue is proper in the district where the petitioner resides, where the agency action will be enforced, or where the agency's principal office is located. Ind.Code § 4–21.5–5–6(a). This provision implies that the agency is a proper party to a petition challenging the agency action, as the provision is similar to Indiana Trial Rule 75(A), which indicates that preferred venue may lie in the county in which the parties to the action reside, in which the parties' principal offices are located, or in which the injury occurred.

Chapter 4–21.5–6 deals with civil enforcement of an agency order. "[A]n agency in its own name ... may apply for a court order in a circuit or superior court to enforce an order issued under this article by a verified petition for civil enforcement." Ind.Code § 4–21.5–6–1. Any party to a proceeding before an agency may file a petition to enforce that order. Ind.Code § 4–21.5–6–3(c). Although an agency is not automatically a party to an action to enforce its order, if the agency moves to intervene, "[t]he court *shall* grant an agency's motion to intervene and *shall* allow the agency to intervene as a plaintiff or defendant." Ind.Code § 4–21.5–6–3(f) (emphasis added). Therefore, it is clear that when a party to an agency proceeding is not abiding by an agency's decision or order, an agency is a proper party to an action to enforce such a decision or order.

Although the aggrieved employee brings the alleged discrimination to the Commission's attention, it is the Commission's responsibility to protect employees from the discriminatory practices of employers, as well as to protect employers from baseless allegations of discrimination by employees. *See* Ind.Code § 22–9–1–2. Such protec-

tion logically extends to a challenge to the Commission's finding of either discrimination or groundlessness of the allegation, as the Commission has an interest in ensuring that its orders are enforced. *See* Ind. Code § 4–21.5–6–1 (permitting an agency to apply to a trial court for enforcement of the agency's order); *cf. Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs,* 519 U.S. 248, 275, 117 S.Ct. 796, 136 L.Ed.2d 736 (1997) (Scalia, J., dissenting) (arguing that the agency's director did not have an interest in challenging the agency's board's judgment because nullification of one of his own orders is not at issue).

The manner in which our legislature has structured the procedure for those alleging employer discrimination also indicates that the Commission is a proper party on appeal. Both the ICRC and the Commission, after receiving a complaint, have the power to not only award damages to the complainant, but also to order remedial action, such as requiring the employer to post notice of Indiana's civil rights policy and the employer's compliance with the policy, periodically furnish the agency with proof of such compliance, and show cause to the agency why any state license held by the employer should not be revoked or suspended. *See* Ind.Code §§ 22–9–1– 6(k), –12.1(c). If the Commission chooses to take any of these actions, but does not award damages to the complainant, and the employer seeks judicial review of the Commission's decision, the complainant would have no real incentive to defend the Commission's decision in the trial court. Disallowing the Commission to be a party in the trial court would thereby allow an employer to challenge a decision unopposed. We cannot believe that the legislature would intend such a result.

We recognize that in this case, the Employees' counsel participated at the agen-

cy, trial court, and appellate levels. However, we do not believe that the existence of adversity prohibits the Commission from participating in an appeal. *Cf. Ingalls Shipbuilding, Inc.,* 519 U.S. at 266–67, 117 S.Ct. 796; *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 42 n. 5 (2d Cir.1976) ("The existence of sufficient adversity between private parties has not been thought to preclude the Government's right to be a party in many other sorts of review of federal administrative action."), *aff'd* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

We recognize that the Indiana appellate rules do not contain the explicit provision, present in their federal counterpart, that an agency "must be named a respondent" in actions challenging an agency's order. *See* Fed. R.App. Pro. 15(a). However, it has long been the general practice in both state and federal courts that an administrative agency is a party in an appeal regarding that agency's action. *See Pittston Stevedoring Corp.,* 544 F.2d at 42 n. 5 (recognizing that it would be "a novel form of review of federal administrative action in which no one representing the Government would be a party"). Indeed, research has disclosed numerous Indiana cases in which either a local civil rights commission or the ICRC was a party to a proceeding reviewing its decision. *See ICRC v. Alder,* 714 N.E.2d 632 (Ind.1999); *ICRC v. Culver Educ. Found.,* 535 N.E.2d 112 (Ind.1989); *Weatherbee v. ICRC,* 665 N.E.2d 945 (Ind.Ct.App.1996), *trans. denied; ICRC v. S. Ind. Gas & Elec. Co.,* 648 N.E.2d 674 (Ind.Ct.App.1995), *trans. denied; ICRC v. Marion County Sheriff's Dep't,* 644 N.E.2d 913 (Ind.Ct.App.1994), *trans. denied; ICRC v. Wellington Village Apts.,* 594 N.E.2d 518 (Ind.Ct.App.1992), *trans. denied, disapproved of on other grounds, Alder,* 714 N.E.2d 632; *ICRC v. Weingart, Inc.,* 588 N.E.2d 1288 (Ind.Ct. App.1992); *ICRC v. Am. Commercial Barge Line Co.,* 523 N.E.2d 241 (Ind.Ct. App.1988), *trans. denied, cert. denied,* 492 U.S. 920, 109 S.Ct. 3246, 106 L.Ed.2d 592 (1989); *ICRC v. Kidd & Co., Inc.,* 505 N.E.2d 863 (Ind.Ct.App.1987), *trans. denied; ICRC v. Midwest Steel Div. of Nat'l Steel Corp.,* 450 N.E.2d 130 (Ind.Ct.App. 1983); *ICRC v. Sutherland Lumber,* 182 Ind.App. 133, 394 N.E.2d 949 (1979); *Ind. Univ. v. Hartwell,* 174 Ind.App. 325, 367 N.E.2d 1090 (1977) (Bloomington Human Rights Commission was also a named party). Although these cases did not explicitly address whether the commissions were proper parties, they demonstrate that the presence of the ICRC or a local commission as party is generally accepted.[11] We do not believe that the lack of a specific provision in the Indiana Appellate Rules indicating that an agency is a proper party

---

11. In support of its argument that the Commission lacks standing, Filter cites to a Seventh Circuit case, *Richmond v. St. Joseph Care Ctr. W.,* 190 F.3d 500 (7th Cir.1999), in which the only parties were the employee and the employer. However, this case is wholly inapplicable, as it involved the district court's dismissal of a Title VII complaint filed in federal court, not an appeal of a local commission's order. *See id.* at 501. We also note that in its brief, Filter cited this case using the incorrect party name ("St. Joe" instead of "St. Joseph"), and the incorrect volume number of the Federal Reporter (195 instead of 190), causing difficulty in locating the case.

Research has disclosed a single case in which the ICRC or a local commission was not a named party to an action reviewing its decision. *See Ind. Dep't of Natural Res. v. Cobb,* 832 N.E.2d 585 (Ind.Ct.App.2005), *trans. denied.* However, the appellee's brief in *Cobb* was prepared and filed by Staff Counsel for the ICRC on behalf of the employee. *See* 2005 WL 1104756. Further, even if cases do exist in which the ICRC or a local commission is not a named party, this fact does not negate the fact that the ICRC or a local commission has routinely been a party to proceedings reviewing the commissions' decisions.

in a proceeding challenging its action indicates that the agency is not a proper party. *Cf. Ingalls Shipbuilding, Inc.,* 519 U.S. at 275, 117 S.Ct. 796 (Scalia, J., dissenting) ("That parties in whose favor the judgment under review runs are ordinarily proper respondents or appellees in the courts of appeals is so obvious that the Federal Rules of Appellate Procedure ... do not bother to provide for the naming of such individuals.").

Indiana Appellate Rule 9 indicates that when appealing an order, ruling, or decision of an administrative agency, the party appealing the order shall file a Notice of Appeal with that agency. This rule provides further support for a conclusion that an agency is a proper party in a proceeding challenging that agency's action.

Without some sort of indication in a statute or procedural rule that the Commission is precluded from defending its action, we decline to hold that it is precluded from participating in appeals of this sort. *See Pittston Stevedoring Corp.,* 544 F.2d at 42 n. 5. We conclude that the trial court properly joined the Commission as a party.

### IV. Sufficiency of the Evidence

#### A. Standard of Review

 When reviewing an administrative agency's decision we apply the same standard of review as did the trial court. *Hendricks County Bd. of Zoning Appeals v. Barlow,* 656 N.E.2d 481, 483 (Ind.Ct. App.1995). In reviewing the Commission's decision, we are limited to determining "whether there is substantial evidence to support its decision, and whether its decision was arbitrary, capricious, an abuse of discretion, or in excess of its statutory authority." *Ind. Dep't of Envtl. Mgmt. v. West,* 838 N.E.2d 408, 415 (Ind.2005); *see also* Ind.Code § 4–21.5–5–14(d). We will defer to the Commission's factual findings as long as they are supported by substantial evidence. *Weatherbee,* 665 N.E.2d 945, 947. However, we are not bound by the Commission's determinations of law, and likewise are free to resolve any legal questions that arise from the Commission's decision. *West,* 838 N.E.2d at 415. Finally, "an agency's findings of ultimate fact, defined as factual conclusions derived from basic facts, are subject to a reasonableness standard of review." *Weatherbee,* 665 N.E.2d at 948. "Whether the ultimate fact of discrimination was a reasonable inference from the basic facts is a question of law properly subject to the scrutiny of the court." *Id.*

#### B. The Commission's Findings

 Before addressing the merits, we note that many of the Commission's "findings of fact" are not true findings, as they merely restate the testimony of witnesses. *See Augspurger v. Hudson,* 802 N.E.2d 503, 515 (Ind.Ct.App.2004) (Sullivan, J., concurring in result) (indicating that recitations of witness testimony are not findings); *In re Adoption of T.J.F.,* 798 N.E.2d 867, 874 (Ind.Ct.App.2003) ("A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z."). This court is fully capable of reading the transcript of witnesses' testimony; "findings" that merely inform this court that witnesses testified as to certain facts do not aid this court in its review. *Cf. Perez v. U.S. Steel Corp.,* 426 N.E.2d 29, 33 (Ind.1981) (indicating that findings that merely restate testimony "are not findings of basic fact in the spirit of the requirement"). Findings of fact are a mechanism by which an administrative agency completes its function of weighing the evidence and judging witnesses' credibility. Therefore, "the trier of fact must adopt the testimony of the witness before the 'finding' may be considered a finding of fact."

*In re T.J.F.*, 798 N.E.2d at 874. When an agency enters purported findings that merely restate testimony, this court will not "cloak the [agency's] recitation in the garb of true factual determinations and specific findings as to those facts." *Augspurger*, 802 N.E.2d at 515. Instead, we treat these purported findings as surplusage. *See Perez*, 426 N.E.2d at 33.

### C. Review of the Commission's Decision

#### 1. Burden of Proof

■ For claims of employment discrimination filed with the ICRC or a local commission, Indiana has adopted the allocation of burdens set by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for claims filed under Title VII of the Civil Rights Act of 1974. *See Weatherbee*, 665 N.E.2d at 951. When analyzing whether or not the parties have met their respective burdens, federal cases analyzing Title VII claims "are entitled to great weight." *Culver Educ. Found.*, 535 N.E.2d at 115. Under *McDonnell Douglas:*

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quotations and citations omitted).[12]

■ We conclude that Filter has put forth a legitimate, nondiscriminatory reason for terminating the Employees and that, as a matter of law, the Employees have not put forth sufficient evidence to demonstrate that this reason was not the true reason for their discharge. Therefore, it is not necessary for us to hold whether or not the Employees introduced sufficient evidence to establish a prima facie case of discrimination. However, in discussing why the Employees have failed to meet their burden of demonstrating that Filter's proffered reason was not the true reason, we will examine the evidence supporting the Commission's finding of a prima facie case, as such evidence is relevant to our ultimate determination that the Employees failed to introduce sufficient evidence to support the Commission's finding of intentional discrimination. *See Holcomb v. Powell*, 433 F.3d 889, 897 (D.C.Cir. 2006).

#### 2. Filter's Proffered Reason for Terminating the Employees

##### a. The Honest Belief Rule

The federal circuits have split as to the correct test for determining whether the

---

**12.** Of course, the employee may also introduce direct evidence of discrimination, the proverbial "smoking gun." If such evidence exists, it may be unnecessary to use this indirect method of demonstrating discrimination.

*See generally, Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). In this case, the Employees have not attempted to prove discrimination through direct evidence.

employer's proffered reason for an adverse employment action was the true reason or was merely a pretext for discriminatory action. *See generally,* Rebecca Michaels, Note, Legitimate Reasons for Firing: Must They Honestly Be Reasonable?, 71 FORDHAM L.REV. 2643, 2667 (2003). The first view, put forth most strongly by the Seventh Circuit, holds that if the employer honestly believed the reasons it gave for taking the action, the employee loses "even if the reasons are foolish, trivial or baseless." *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 541 (7th Cir.2007). Stated another way, "even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Little v. Ill. Dep't of Revenue,* 369 F.3d 1007, 1012 (7th Cir.2004). The other view, put forth by the Sixth Circuit, requires the employer to demonstrate "that its belief was reasonably grounded on particularized facts that were before it at the time of the employment action," and that the employer made "a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir.1998).

All other federal circuits have also adopted some form of the honest belief rule. *See Davila v. Corporacion De Puerto Rico Para La Difusion Publica,* 498 F.3d 9, 17 (1st Cir.2007) ("[A]s long as [the employer] believed that the [employee's] performance was not up to snuff—and the [employee] has presented no evidence suggesting that management thought otherwise—it is not our province to second-guess a decision to fire him as a poor performer. That is true regardless of whether, to an objective observer, the decision would seem wise or foolish, correct or incorrect, sound or arbitrary."); *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir.2007) ("Here, the uncon-

tested evidence established that [the decisionmaker] honestly believed that [the employee] deserved to be discharged for threatening [the company's vice-president], regardless of whether [the employee] did in fact issue the threats."); *Woodruff v. Peters,* 482 F.3d 521, 531 (D.C.Cir. 2007) ("We review not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." (quotation omitted)); *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 935 (8th Cir.2006) ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination."); *Atkinson v. LaFayette College,* 460 F.3d 447, 454 (3d Cir.2006) (requiring that "[t]he plaintiff must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."); *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 215–16 (2d Cir.2006) (recognizing that although the Second Circuit has applied "arguably inconsistent standards in evaluating the legitimacy of a reason given to justify a challenged employment action," it remains clear that courts in that circuit are "not interested in the truth of the allegations against the [employer]," and instead are "interested in what 'motivated the employer'") (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)); *Cooper v. S. Co.,* 390 F.3d 695, 729 (11 th Cir.2004) ("However, the critical question here is not whether [the employee] fulfilled the requirements, but whether [the employer] honestly believed that [the employee] did not meet the criteria."), *cert.*

*denied,* 546 U.S. 960, 126 S.Ct. 478, 163 L.Ed.2d 363 (2005); *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir.2002) ("In judging whether [the employer's] proffered justifications were 'false,' it is not important whether they were *objectively* false (e.g., whether [the employee] *actually* lied).") (emphasis in original); *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir. 1999) ("The issue is whether [the employer's] perception of [the employee's] performance, accurate or not, was the real reason for [the employee's] termination."); *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999) ("The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."), *overruled on other grounds, Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991) ("Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.... [A] dispute in the evidence concerning ... job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.").

Research has disclosed no case from these courts explicitly endorsing or rejecting the approaches of the Sixth or Seventh Circuit, although the above citations seem to indicate that some of the circuits' approach more closely resembles the Seventh Circuit's. Likewise, no Indiana case has examined these two approaches. However, it remains clear that Indiana courts, like all federal courts, follow the "honest belief" rule. *See Purdy v. Wright Tree Serv., Inc.,* 835 N.E.2d 209, 214 (Ind.Ct. App.2005) ("The court need only address the issue of whether the employer honestly believes in the explanation it offers."), *trans. denied; Powdertech, Inc. v. Joganic,* 776 N.E.2d 1251, 1260 (Ind.Ct.App. 2002) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

In *Purdy* and *Powdertech,* this court has cited language originating in a Seventh Circuit case following its own version of the honest belief rule. *See Powdertech,* 776 N.E.2d at 1262 (citing *Motley v. Tractor Supply Co.,* 32 F.Supp.2d 1026 (S.D.Ind.1998)) (citing *Hughes v. Brown,* 20 F.3d 745, 747 (7th Cir.1994) ("An employee may establish pretext by proving one of the following: '(1) [d]efendant's explanation had no basis in fact, or (2) the explanation was not the "real" reason, or (3) at least the reason stated was insufficient to warrant the discharge.'" (quoting *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir.1994)))). Although the Seventh Circuit's approach has been described as a "'pure' honest view," Rebecca Michaels, Note, Legitimate Reasons for Firing: Must They Honestly Be Reasonable?, 71 FORDHAM L.REV. 2643, 2657 (2003), review of Seventh Circuit decisions makes clear that its approach does involve an examination of the objective reasonableness of an employer's belief. *See Little,* 369 F.3d at 1013 (recognizing that a plaintiff could succeed by showing that the employer's reliance on a "report was so unreasonable as to create the inference that [the supervisor] subjectively did not believe the report's conclusions"); *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 290 (7th Cir.1999) (holding that, given the circumstances, the jury was free to find that the employer's reason for firing the employee was not its true reason, and noting that the employer's explanation "does not

pass the straight-face test"); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 516 (7th Cir.1999) ("[T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held."); *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir.1996) (recognizing that the employer's explanation was "so perverse as to cast additional doubt on its good faith").

We also point out that although the Sixth Circuit's approach involves an assessment of the reasonableness of the employer's belief, the focus remains on whether the employer acted with discriminatory intent, and not on the ultimate validity of the reason. The Sixth Circuit has explained its version of the honest belief rule as follows:

> The honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment. The defendant may rebut the plaintiff's evidence of pretext, by demonstrating that the defendant's actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent. We give the defendant an opportunity to show that its intent was pure, because "the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the nondiscriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent."

*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714–15 (6th Cir.2007) (quoting *Smith*, 155 F.3d at 806). The only difference between the two approaches, therefore, is that the Sixth Circuit requires that the employer "demonstrate that its honest belief was 'reasonably based on particularized facts,'" *id.* at 715 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir.2006)), and that it made a reasonably informed and considered decision, *Smith* 155 F.3d at 806. The Seventh Circuit, on the other hand, does not have a standard by which the employer's honest belief must be judged, although it has made clear that objective reasonableness is a pertinent consideration.

 The Seventh Circuit has explained why its version of the honest belief rule best advances the purposes of the Civil Rights Act: "The indirect method is, after all, a means of proving intentional discrimination. Where the employment action is grounded in an honest and permissible reason, there can be no intent to discriminate unlawfully—even if that reason is not reasonably based on particularized facts." *Little*, 369 F.3d at 1012 n. 3. We find the Seventh Circuit's explanation persuasive.[13] The fundamental issue in an employment discrimination suit is whether the employer took adverse employment action against the employee because of some impermissible consideration, not whether the employer's decision was ultimately a wise business decision, fair, or based on just cause. We point out that employees

---

13. We also note the similarity of the two approaches and hypothesize that the ultimate result of a case will rarely turn on which version of the honest belief rule is applied. Indeed, both rules focus on the intent of the employer, put the onus on the employee to show that the employer's reason was baseless, and allow the employer to prevail even when it was mistaken about the reasons, so long as it demonstrates (under the Sixth Circuit's test by pointing to particularized facts and a process indicating the employer made a reasonably informed decision) that it honestly believed in the reason at the time of the employment action. As explained, *infra*, note 17, we conclude the result in this case would be the same under either approach, as Filter has pointed to particularized facts and indicated that its decision was reasonably informed.

who are indeed terminated without just cause have the remedy of unemployment benefits.[14] *See* Ind.Code § 22–4–15–1. The Seventh Circuit's approach best distinguishes discrimination suits from those involving unemployment applications claiming termination was not for just cause. The role of the Commission, after all, is to not only protect employees, but also to ensure employers are found liable only when they engage in discriminatory, and not merely unwise, hasty, or unwarranted action. *See* Ind.Code § 22–9–1–2(c); *cf. Ind. Bell Tel. Co., Inc. v. Boyd,* 421 N.E.2d 660, 667 (Ind.Ct.App.1981) ("For a redressible discriminatory practice to occur, there must be something more than a disappointment borne by an employee who happens to fit the characteristics of a protected classification.").

■■■ Further, the Sixth Circuit's approach inherently involves judicial examination of the sufficiency of an employer's decision-making process in hiring, disciplining, or terminating employees. Indiana decisions have made clear that in the context of employment discrimination cases, we do not reexamine an employer's business decisions. *Purdy,* 835 N.E.2d at 214; *Cobb,* 832 N.E.2d at 593; *Thayer v. Vaughan,* 801 N.E.2d 647, 650 (Ind.Ct. App.2004) (opinion on reh'g), *trans. denied; Powdertech,* 776 N.E.2d at 1260; *Elliott v. Sterling Mgmt. Ltd.,* 744 N.E.2d 560, 565 (Ind.Ct.App.2001).

■■■ Based on these considerations, we explicitly adopt the Seventh Circuit's version of the honest belief rule.

### b. Filter's Honest Belief that the Employees Committed Timecard Fraud [15]

■■■ As stated above, the objective reasonableness of the employer's belief is a relevant consideration in determining whether the belief was honestly held. Also, if the employer's honest belief is based on an unfounded stereotype or discriminatory belief, the employer is not shielded from liability. *See Culver Educ. Found.,* 535 N.E.2d at 115 (recognizing that employer's reason must be nondiscriminatory); *cf. Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 45–46 (1st Cir.2002) ("[T]he employer might believe its stated reason for its action and honestly believe that the reason was nondiscriminatory, while the jury might find that the same reason was honestly held but conclude that it constituted discrimination (e.g., stereotyping)."). However, although the finder of fact may disbelieve a stated reason and find that the employer was actually motivated by racial bias, it is not enough for the evidence to merely establish "that the employer made a decision that was wrong or mistaken." *Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir.1997). Instead, there must be actual evidence from which the finder of fact can infer some illegitimate motive for the action. *See Fane,* 480 F.3d at 541 (holding that "no reasonable jury could conclude that the firm's failure to follow progressive discipline procedures suggested discrimination"); *Weatherbee,* 665 N.E.2d at 952. That is, the Employees "must do more than simply impugn the legitimacy of the asserted justification for [their] termination; in addition, [they] 'must produce

---

14. Both Employees in this case did receive unemployment benefits.

15. Although we have adopted the Seventh Circuit's approach, we cite Sixth Circuit cases in our analysis as the Sixth Circuit's test

places a higher burden on the employer. Such citations also enforce our statement above that the ultimate result of a case is rarely dependant on which approach is used.

sufficient evidence from which the [trier of fact] may reasonably reject the employer's explanation.' " *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994)).

■ Here, the Employees have failed to introduce evidence that Filter did not honestly believe that the Employees committed timecard fraud or that Filter's true motive for terminating the Employees was discrimination. In reaching the opposite conclusion, the Commission improperly assigned to Filter the burden of proving that the Employees actually committed timecard fraud. It found that Filter "has failed to provide sufficient evidence to support their termination of the [Employees]." Appellant's App. at 12. Although this finding would be relevant in a case involving unemployment benefits, as explained above, the relevant inquiry in discrimination suits is not whether the Employees actually committed timecard fraud, but whether Filter honestly believed that the Employees committed the violation. At no point did the Commission make any findings indicating that Filter did not actually believe that the Employees committed timecard fraud. Therefore, the Commission's findings are legally insufficient to support its conclusion that Filter's reason for terminating the Employees was not honestly held and was instead pretextual. *See Fields v. Conforti*, 868 N.E.2d 507, 512 (Ind.Ct.App.2007) ("A judgment is clearly erroneous if it relies on an incorrect legal standard."); *Wal–Mart Stores, Inc. v. Bailey*, 808 N.E.2d 1198, 1206 (Ind.Ct.App. 2004) (reversing trial court after examining the language used in the trial court's judgment and concluding that the trial court applied an incorrect legal standard), *trans. denied.*

On the other hand, the circumstances of this case indicate that Filter believed the Employees committed time fraud, but was willing to allow the Employees to continue working if they admitted the violation. Filter was permitted, pursuant to its handbook, to terminate the Employees immediately upon determining that they committed timecard fraud. However, it chose to give them a chance to continue working, apparently without even a suspension, which was required under Filter's policy. We recognize that if the Employees did not in fact commit timecard fraud they would be reluctant to take advantage of such an agreement. However, the undisputed fact that Filter offered them a chance to continue working is difficult to reconcile with a finding that Filter's proffered reason was pretextual.

The dissent points to the following as sufficient support for the Commission's ultimate conclusion that Filter's reason for terminating the Employees was pretextual: " 'the lack of eyewitnesses to the alleged incident, the fact that the time clock records reflected other employees punching in at the same time on occasion and the lack of discipline for those employees,' and its apparent skepticism of Wirtz's account of the incident and her investigation." Dissent, op. at 590 (citing Appellant's App. at 12–13).

In regard to Filter's investigation into the matter, it is not enough to show merely that Filter made its determination that the Employees committed timecard fraud hastily or without a complete investigation. *See Little*, 369 F.3d at 1013 (noting that the argument that an employer's "investigation was so shoddy as to give rise to an inference of discriminatory intent ... would be a nonstarter"); *Rivera–Aponte v. Restaurant Metropol # 3, Inc.*, 338 F.3d 9, 11 (1st Cir.2003) ("Whether a termination decision was wise or done in haste is irrel-

evant, so long as the decision was not made with discriminatory animus.").[16]

The Commission's findings of fact note testimony indicating that Filter could not produce eyewitnesses who saw Brooks enter Weathers's employee number. We think it obvious that a company may discipline employees for violations based on circumstantial evidence. We also note the relative difficulty of producing such an eyewitness in this case. Brooks admittedly clocked herself in; therefore, her presence at Time Clock 1 is not in question. Brooks merely denies entering Weathers's employee number. The only way Filter would be able to produce the kind of eyewitness the Commission apparently desires would be if someone was standing in close enough proximity to Brooks to see every number she entered on the machine.

Although we recognize that Filter could have conducted a more extensive investigation, nothing in the record indicates that Filter did not honestly believe that the Employees committed timecard fraud. This belief was based on evidence that the Employees were clocked in at the same time on the same time clock, and Wirtz's observations indicating that Weathers could not have made it to Time Clock 1 in time to clock in at the same time as Brooks. Wirtz also compared the time that other employees whom she observed Weathers pass on the way into the facility clocked out, and felt that this information provided further support for her belief that the Employees had committed time-

card fraud. Finally, Wirtz spoke with employee Christian Crouch, who had seen Weathers enter the plant at around four minutes after 7:00. Although Weathers testified that she saw Crouch when she entered the plant for the second time, Wirtz's speaking to Crouch contributes to the overall reasonableness of her investigation.[17]

■ The Commission's observation that other employees had clocked in at the same time without discipline is somewhat irrelevant, as it is not a violation of company policy to clock in during the same sixty-second period as another employee. The fact that Weathers and Brooks were clocked in at the same time was merely evidence that Brooks had clocked Weathers in. As discussed above, Wirtz's observations indicate that Weathers would not have been able to make it to the time clock quickly enough to have clocked in at the same time as Brooks. The fact that other employees clocked in at the same time therefore is not "substantial evidence" supporting the Commission's decision.

■ In short, the Commission's findings, although they point out the incomplete nature of Filter's investigation, do not indicate that Filter's belief was not honestly held or that its decision to terminate the Employees was motivated by racial stereotypes or discrimination. We conclude that the evidence does not support a finding that Filter did not honestly believe that the Employees committed ti-

---

**16.** Even the Sixth Circuit does "not require the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807.

**17.** Indeed, by pointing to these particularized facts and explaining its reliance on these facts, Filter appears to have met the Sixth Circuit's requirements. *Stonum v. U.S. Airways, Inc.*, 83 F.Supp.2d 894, 902 (S.D.Ohio 1999) (holding summary judgment appropri-

ate where employer pointed to particularized facts and the employee failed to produce evidence "suggesting that [the employer's] decision to terminate her was not based upon this information"); *Parker v. Key Plastics, Inc.*, 68 F.Supp.2d 818, 830 (E.D.Mich.1999) (examining the employer's reasons and finding "no basis for questioning the decisional process that led to [the employee's discharge]").

mecard fraud. We make this conclusion not, as suggested by the dissent, by reweighing evidence. We make no statement at all as to whether the Employees *actually* committed timecard fraud, and readily acknowledge that the evidence is conflicting as to this point.[18] The evidence that concerns this court, and that should have concerned the Commission, is that evidence indicating that Filter did not believe the Employees committed timecard fraud when it terminated their employment. We conclude that no such substantial evidence exists.

### 3. Treatment of Other Employees

■■■■ Although the Employees cannot show that Filter did not honestly believe that the Employees had committed timecard fraud, they may prevail under the alternative theory "that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the [employee]." *Powdertech*, 776 N.E.2d at 1260 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir.2001)). To meet this burden, the Employees must demonstrate that they were similarly situated to the other

employees against whom the employer took lesser action. *See E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801–02 (10th Cir. 2007). Whether or not employees are similarly situated is a question of fact.[19] *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir.2007). Employees are similarly situated "when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *Id.* (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir.2006)).

■■■ The Employees introduced evidence of Filter's treatment of four white employees who violated various employment rules.

J.M. made an inappropriate racial comment towards another employee and received a written warning. Later, J.M. threw a crowbar at another employee's feet, and was suspended for three days. J.M. was then terminated for leaving his assigned work area and taking an extended break. J.M. was subject to Forbes's supervision.

J.S. received a written warning for walking off the job in 2002. In 2003, J.S. received another written warning for low

---

**18.** The evidence is conflicting as to whether the Employees *actually committed timecard fraud.* The evidence is not conflicting as to whether Filter conducted a reasonable investigation, honestly believed the Employees committed timecard fraud, and terminated the Employees because Filter believed the Employees committed timecard fraud. As indicated above, a fundamental theme of employment discrimination cases is that employees must do more than demonstrate merely that they did not commit the violation for which they were terminated; employees must demonstrate that their employers did not believe they committed the violation.

**19.** We note that the Commission did not explicitly find that the employees pointed to by

the Employees were similarly situated. As the dissent points out, two of the employees to which the Commission compared the Employees' treatment were not subject to the same supervisor and are not similarly situated. *See* Dissent, op. at 587 n. 27 (citing *Cobb*, 832 N.E.2d at 592). That the Commission relied on two employees who were disciplined under distinct supervisors reinforces our fear that the Commission misapplied the law. *Cf. Ramsey v. Ramsey*, 863 N.E.2d 1232, 1239 (Ind.Ct.App.2007) (recognizing that although we presume a trial court knows and follows the applicable law, this presumption can be overcome by an examination of the trial court's findings).

quality work. In 2004, J.S. drew an obscene picture on a roll of material and was immediately terminated. J.S. was subject to Forbes's supervision.

W.R. received an oral warning for falling asleep on the job and then a written warning for falling asleep a second time. Roughly a month later, Wirtz found W.R. asleep for a third time and terminated his employment.

Finally, in 1998 R.H. received a written warning for showing up at work after consuming alcohol. In 2002 R.H. was involved in an argument with another employee. The other employee accused R.H. of making innuendos regarding the employee's race, but R.H. denied making such innuendos. It does not appear that R.H. received a warning for this incident. In 2004, R.H. removed a tractor, without permission, from the home of Filter's president. Wirtz terminated R.H. for this conduct.

The Employees have failed to introduce evidence that Filter treated similarly situated employees differently from the Employees. Initially, we note that the Employees have pointed to no evidence of the other employees' position within the company, and the Commission made no findings on this point. *See Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir.2006) (holding that employee failed to show that another employee was similarly situated because the other employee held a different position). However, as the dissent points out, we may glean from materials in the appendices that all four

employees occupied production, and not management positions. Whether or not non-management employees, who have been employed for an un-identified duration, where we have no evidence of the qualifications or skills required for each particular job, may be considered "similarly situated" is debatable.[20] However, it is a debate in which we need not engage, as the other employees were not disciplined for the same or even similar misconduct.

Although we recognize that violations need not be identical, they must be of "comparable seriousness." *Wright,* 455 F.3d at 710. When employees engage in conduct that differs in relevant respects, the employees may not be compared. *Id.* Filter's employment manual clearly indicates that it considers timecard fraud to be an extremely serious offense, one of only six [21] that carry a mandatory punishment of suspension or termination. *See* Appellant's App. at 204 (indicating that "[v]iolation of [this rule] will carry the penalty of immediate suspension and/or discharge" (emphasis in original)). On the other hand, Filter's employment manual indicates that the use of abusive language, leaving the job early without permission, sleeping on duty, and being under the influence of alcohol do not require immediate suspension or termination. *See id.* at 203 (indicating that these violations "*may* carry a penalty of immediate suspension and/or discharge" (emphasis added)). By specifically requiring that timecard violations result in a suspension or termination,

---

**20.** We also note the dissent's emphasis on the fact that this was the Employees' first offense. *See* Dissent, op. at 588. We point out that Weathers had acquired "points" for previous violations. *See* Appellant's App. at 105 (Weathers testifying that she had acquired 8 points). As we do not have the entire transcript before us, we are unable to tell whether Brooks had any previous violations.

**21.** The other five violations that carry a mandatory suspension or termination are fighting, providing false information to someone preparing company records, theft or sabotage of Filter's property, carrying weapons onto Filter's property, and using or selling illegal drugs on Filter's property.

Filter has indicated that it takes violations that involve dishonesty and theft more seriously than the other employees' violations, except that of R.H., who was immediately terminated. Therefore, the violations pointed to by the Employees are not of "comparable seriousness" to their own violation. We make this conclusion not by undertaking a subjective analysis of the seriousness of these offenses, but by looking objectively at Filter's handbook, which clearly classifies timecard fraud as a more serious offense than the others. We recognize, as does the dissent, that Forbes considered one of the other violations to be "pretty severe." *See* Dissent, op. at 588 (citing Appellant's App. at 128). That Forbes believed one of the other employee's violations to be "pretty severe" does not mean that he or Filter believed such a violation to be *as serious* as timecard fraud. We also note that Forbes personally did not want to terminate the Employees for timecard fraud, and agreed to present them with the "last chance agreement" as a compromise with Wirtz, who wanted to terminate them immediately. Most importantly, Forbes's testimony also does not change the fact that Filter's Handbook presents undisputed evidence that Filter considered the Employees' violations to be *more* serious than the other violations.

▐▐ It is apparent that the Commission improperly undertook the task of second-guessing Filter's determination of the seriousness of these offenses. *See* Commission's Brief at 13 ("[I]t is the Commissions [sic] duty to weight [sic] the evidence and determine whether allegedly punching in for someone is as serious as intoxication, sleeping, altercations, walking off the job, racial comments or throwing heavy objects, in determining similarly situated employees."). On the contrary, as we have repeatedly indicated, the finder of fact does "not sit as a super-personnel department that reexamines an entity's business decisions." *Powdertech*, 776 N.E.2d at 1260 (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987)). Indeed, the Commission's belief of what constitutes a "serious" offense is largely irrelevant. *Cf. Riggs*, 497 F.3d at 1121 ("Regardless of whether the offenses committed by [other employees] were 'egregious and immediately terminable' as [the employee] claims, no evidence suggests that the employer considered these offenses to be as egregious as [the employee's offense]."). Instead, the Commission was entitled to compare only "similar misconduct." *See Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir.2001) (refusing to compare employees who violated different rule where there was "no dispute that a violation of Rule 8 is substantially more serious than a violation of Rule 16 and that discharge is an appropriate punishment for a Rule 8 violation"); *ICRC v. Marion County Sheriff's Dep't*, 644 N.E.2d at 916 (refusing to compare an employee who was discharged for battery with an employee who was discharged for sexual harassment). A violation of Filter's timecard fraud policy is fundamentally different from the violations cited by the Employees.[22] *Cf. Wright*, 455 F.3d at 710 (concluding employees were not similarly situated "because their alleged acts of misconduct are of a very different nature, and there are legitimate reasons why [the employer] would treat them differently"); *Powdertech*, 776 N.E.2d at 1261 (recognizing the difference between company's alcohol policy violations and

---

22. We also note that the other employees all admitted their violations by signing their written warnings, and that the Employees did not admit to committing time card fraud.

discipline policy violations). None of the other violations relate to falsifying company records. *See Williams v. Penske Transp. Serv., Inc.*, 46 F.Supp.2d 1135, 1142 (D.Kan.1999) (noting that assault differs from fraud, and concluding that the offenses are not comparable, as "the former may raise concerns about an employee's ability to get along with other employees in the workplace while the latter may implicate concerns about an employee's trustworthiness"). Only R.H.'s act of taking a tractor involves dishonesty, and R.H. was terminated for this violation. Although the Commission may have felt that some of the other employees engaged in behavior more egregious than timecard fraud, this was not its or the court's call to make. Instead, we must allow employers to set their own standards regarding the severity of different conduct. *See Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir.2004) ("[The employer] was not obligated to treat the two behaviors as substantially similar because they involved objectively different conduct."); *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1233 (10th Cir.2000) (noting that although it seemed to the court that two acts were equally serious, it was "reluctant to require [the employer] to view [the] actions as equally unacceptable"); *Williams,* 46 F.Supp.2d at 1142.

Because of this material difference in conduct, the Employees have failed to point to any similarly situated employee whom Filter treated differently from them.

### 4. Failure to Show Intentional Discrimination

■ The Commission's findings and conclusions suggest that it misunderstood its role and the relevant burdens placed on the parties. The Commission focused on two things: (1) whether or not it would have found sufficient evidence that the Employees committed timecard fraud; and

(2) whether it felt that timecard fraud was as serious a violation as dissimilar violations committed by other employees. We emphasize two important principles.

First, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Filter was not required to prove that the Employees committed timecard fraud. Filter was merely required to put forth a legitimate reason for terminating the Employees; committing timecard fraud is clearly such a reason, as Filter's manual clearly indicates the seriousness of such a violation of company policy. At this point, the Employees were required to introduce evidence that this reason was a pretext for racial discrimination. *See Vasquez v. County of Los Angeles,* 349 F.3d 634, 642 (9th Cir.2003) ("[A] plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives."). Not only did the Employees fail to introduce such evidence, the unique facts of this case clearly show that Filter's reason was not pretextual. Filter discharged the Employees only after giving them a chance to keep their jobs by signing the "last chance agreement." It was clear and undisputed that Forbes wanted to retain the Employees, and that he terminated them only after the Employees declined to sign the agreement. This circumstance is strong evidence of lack of pretext and was virtually ignored by the Commission. Instead, the Commission, after finding that it did not believe Filter had provided sufficient evidence to prove the Employees committed timecard fraud, leapt to the conclusion that Filter therefore must have terminated the Employees because of their race. In so concluding, the Commission failed to cite evidence that the Employee's race had played

any part in Filter's decision, and most importantly, to any substantial evidence that Filter did not actually believe that Brooks had clocked in Weathers.

Second, the Commission is not a super-personnel department entitled to review a company's regulations and reject that company's determination of the relative seriousness of offenses. Filter clearly felt that timecard fraud was a serious offense, as it designated it as one of only six offenses that required suspension or termination. The Commission repeatedly and improperly interjected its personal beliefs regarding the relative seriousness of this offense, discussing at length Filter's failure to discharge other employees who had committed offenses the Commission deemed to be more serious than that committed by the Employees. Regardless of whether the Commission, the trial court, or this court believes that the other offenses are more serious than timecard fraud, it was not the Commission's province to determine whether Filter's termination of the Employees was fair or a prudent business decision. It was the Commission's province to decide only whether Filter was proffering an illusory justification for terminating the Employees in order to cover up racial discrimination.

We conclude that the Employees have failed to meet their burden of showing intentional discrimination. The Employees can show neither that Filter did not honestly believe the Employees committed timecard fraud nor that Filter treated similarly situated employees differently. Moreover, the Employees introduced no evidence of any racial animosity held by Filter. Indeed, Forbes believed the Employees to be good workers and convinced Filter's COO to allow the Employees to continue working if they admitted to having committed timecard fraud. In sum, the Employees have failed to introduce evidence to support the Commission's finding that Filter's termination of the Employees was motivated by racial discrimination. Remembering that the ultimate question of discrimination is one of law subject to this court's scrutiny, *Weatherbee*, 665 N.E.2d at 948, we conclude the Commission's ultimate conclusion that Filter terminated the Employees based on racial discrimination was unreasonable.

## Conclusion

We conclude that Filter was subject to the Commission's jurisdiction and that the Employees' failure to introduce the local ordinance into evidence is not fatal, as we take judicial notice of it at this time. We further conclude that the trial court properly joined the Commission. Finally, we reverse, concluding that the Commission's decision was not supported by substantial evidence.

Reversed.

BRADFORD, J., concurs.

VAIDIK, J., dissents with opinion.

VAIDIK, Judge, dissenting.

I respectfully dissent from the majority's decision to reverse the trial court's order affirming the Michigan City Human Rights Commission's ("Commission") determination that Filter Specialists, Inc. ("Filter") unlawfully terminated the employments of Dawn Brooks ("Brooks") and Charmaine Weathers ("Weathers"). I disagree with the majority's conclusion that the Commission's decision was not supported by sufficient evidence, and I believe that the majority's burden-shifting analysis requires clarification. In addition, I write to express my position on one preliminary matter addressed by the majority. Specifically, I believe that the majority's resolution of Filter's challenge to the Commission's recognition of local law,

while reaching the correct result, is problematic.

Filter argues that Brooks and Weathers did not prove the terms of Michigan City Ordinance No. 3283 (the "Ordinance") during the Commission's agency proceeding and that, therefore, we must conclude that the plaintiffs failed to prove that Filter violated the Ordinance's terms. As the majority explains, a "court may take judicial notice of . . . ordinances of municipalities." Op. at 566 (quoting Ind. Evidence Rule 201(b)). The majority reasons that it is inconsequential that neither party asked the trial court to take judicial notice of the Ordinance because an appellate court, even absent a request to do so, may take judicial notice of a municipal ordinance. Ind. Evidence Rule 201(c), (f). Therefore, the majority elected to take judicial notice of the Ordinance.

Although we are permitted to take uninvited judicial notice of an ordinance under Evidence Rule 201 sections (c) and (f), appellate courts should do so only sparingly. Under Evidence Rule 201(e), a party, upon request, is "entitled . . . to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Further, "[i]n the absence of prior notification, the request may be made after judicial notice has been taken." Ind. Evidence Rule 201(e). Therefore, if an appellate court opts to exercise its right of judicial notice absent a request from a party and the corresponding opportunity of the adverse party to voice its opposition, one of two situations will arise. Either we must be prepared to give the parties an opportunity to be heard on the issue after we have already handed down our appellate decision, which brings with it a host of procedural problems,[23] or we must be prepared to deny litigants their right to be heard as granted by Evidence Rule 201(e). Both of these options are worrisome, and thus I believe that we should do what the majority has done today only in rare circumstances. Further, I do not believe that we need to take judicial notice of the Ordinance because, under the facts of this case, we can infer that the Commission was aware of the Ordinance and took judicial notice of it. This is for the simple reason that, but for the Ordinance, the Commission would not exist. In essence, we can impute judicial notice of the Ordinance to the Commission. Given my concerns about the interplay between Evidence Rule 201 sections (c) and (f) with section (e), this is far preferable to taking judicial notice of the ordinance *sua sponte*.

This matter aside, I respectfully disagree with the majority's conclusion that Brooks and Weathers failed to carry their ultimate burden of persuasion. Because the majority resolved this case upon the third step in the applicable burden-shifting analysis, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (*"McDonnell Douglas"*), it did not need to address the first two steps of the analysis in detail. Therefore, in order to explain why the Commission's decision should be affirmed, I will begin at the first step of our analytical framework.

---

**23.** Parties would be forced to respond to our decision in Petitions for Rehearing, which is troubling. Our longstanding rule is that "new claims or issues . . . cannot be presented for the first time in a petition for rehearing." *N. Ind. Commuter Transp. Dist. v. Chicago SouthShore & South Bend R.R.*, 685 N.E.2d 680, 686 (Ind.1997); *see also State,* *Ind. Dep't of Revenue v. Meadowood I.U. Ret. Cmty., Inc.*, 428 N.E.2d 791, 794 (Ind.Ct.App. 1981) ("This question was not briefed or urged in appellees' brief on appeal, and it cannot be raised for the first time on petition for rehearing.") (quoting *City of Indianapolis v. Wynn*, 239 Ind. 567, 159 N.E.2d 572, 573 (1959)).

As explained by the majority, when evaluating a claim of employment discrimination, we apply the three-step burden-shifting analysis expounded in *McDonnell Douglas*. Op. at 572 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). This analysis placed the initial burden of production squarely upon Brooks and Weathers to establish a *prima facie* case of discrimination. In a case alleging race-based employment discrimination, a *prima facie* case consists of four essential elements: evidence that "1) [the plaintiff] is a member of a protected class; 2) [the plaintiff] was meeting [the] employer's legitimate performance expectations; 3) [the plaintiff] suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir.2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); *see also Ind. Dep't of Natural Res., Law Enforcement Div. v. Cobb*, 832 N.E.2d 585, 591 (Ind.Ct.App. 2005), *reh'g denied, trans. denied.*

Whether a *prima facie* case has been presented is a question of law and is reviewed *de novo*. *Ind. Civil Rights Comm'n v. S. Ind. Gas & Elec. Co.*, 648 N.E.2d 674, 683 (Ind.Ct.App.1995), *trans. denied.* While Brooks and Weathers' claim cannot proceed if they fail to present sufficient evidence to make a *prima facie* case, we must remain mindful that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). There is no question that prongs one, two, and three of this step are satisfied. It is undisputed that Brooks and Weathers are African American and that they were both terminated from Filter's employ. Additionally, Filter makes no argument on appeal that Brooks and Weathers did not meet legitimate job expectations. Indeed, testimony before the Commission reflected that "they were both good employees," Appellant's App. p. 123, and that "they had good work ethics," *id.* at 124.

The only dispute regarding whether the plaintiffs established a *prima facie* case is whether they sufficiently evidenced that "similarly situated employees who were not members of the protected class were treated more favorably." *Fane*, 480 F.3d at 538. This "normally entails a showing that the ... employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Cobb*, 832 N.E.2d at 592 (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000)). While the ultimate question of whether plaintiffs have made a *prima facie* case is a question of law, whether employees are similarly situated is "ordinarily ... a question of fact." *George v. Leavitt*, 407 F.3d 405, 414 (D.C.Cir.2005) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000)). We are thus faced with a factual finding from the Commission that the evidence "demonstrate[d] that other Caucasian employees of the company who engage[d] in far more egregious behavior than that the Claimants were accused of received far less severe forms of discipline by the company for their actions," Appellant's App. p. 11, and "[w]e may not substitute our judgment on factual matters for that of the agency and are bound by the agency's findings of fact if they are supported by substantial evidence," *Cobb*, 832 N.E.2d at 590 (citing *Weatherbee v. Ind. Civil Rights Comm'n*, 665 N.E.2d 945, 947 (Ind.Ct.App. 1996), *reh'g denied, trans. denied* ). We *cannot* disturb the determination that Filter unlawfully terminated the plaintiffs un-

less it was "arbitrary, capricious, an abuse of discretion, or in excess of its statutory authority." *Ind. Dep't of Env't Mgmt. v. West,* 838 N.E.2d 408, 413 (Ind.2005).

The majority examines discipline administered by Filter upon several Caucasian employees[24] and makes the following observations:

> The Employees have failed to introduce evidence that Filter treated similarly situated employees differently from the Employees. Initially, we note that the Employees have pointed to no evidence of the other employees' position within the company, and the Commission made no findings on this point. However, as the dissent points out, we may glean from materials in the appendices that all four employees occupied production, and not management positions. Whether or not non-management employees, who have been employed for an un-identified duration, where we have no evidence of the qualifications or skills required for each particular job, may be considered "similarly situated" is debatable. However, it is a debate in which we need not engage, as the other employees were not disciplined for the same or even similar misconduct.

Op. at 580 (citations omitted).

In my view, the evidence contained in the parties' appendices[25] is sufficient to support the Commission's finding that similarly situated employees were treated more favorably than the plaintiffs. In reviewing this conclusion, "[f]actors to consider include whether the employees 1) had the same job description, 2) were subject to the same standards, 3) were subject to the same supervisor, and 4) had comparable experience, education, and other qualifications." *Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 923 (7th Cir.2007) (citing *Bio v. Fed. Express Corp.,* 424 F.3d 593, 597 (7th Cir.2005)). On the date of their terminations, Brooks and Weathers both held the position of "packer" at Filter, and they both reported to production manager Michael Forbes ("Forbes"). Appellant's App. p. 121–22. Weathers had been a seven-and-one-half-year employee of Filter, and Brooks was a two-and-one-half-year employee. *Id.* at 103, 114. Forbes, as their manager, terminated them, with the urging of human resources manager Diana Wirtz ("Wirtz"). *Id.* at 124, 147. Contrary to the majority's assertion that we know nothing about the positions of other previously disciplined employees, we do know, for example, that employee J.M.[26] was a felt line worker who received a written warning, upon which Forbes "signed off," *id.* at 125, for making "discriminatory" "racial remarks" to an Af-

24. The majority's discussion of Filter's discipline of other employees is in the context of whether Brooks and Weathers established pretext under prong three of our test.

25. It is worth note that we are presented with an incomplete record. Specifically, we have only part of the transcript of the Commission's fact-finding hearing. In compliance with Indiana Appellate Rule 50(2)(g), both parties have included portions of this transcript in their appendices. Ordinarily, however, we would also have at our disposal a full transcript and a bound exhibit volume allowing us to review without confusion the evidence that was before the Commission. *See*

Ind. Appellate Rules 11, 12, 29. We have neither. It is unclear why the full transcript is absent from the record. In fact, Filter's Notice of Appeal notes, "A transcript of the evidence presented at the hearing before the Michigan City Human Rights Commission is the only transcript needed, and is a part of the existing record." Appellant's App. p. 97. Lack of a full transcript in this case has hindered a thorough review of the evidence upon which the Commission relied.

26. Initials will be used to identify other Filter employees whose disciplinary records are referenced.

rican American employee, *id.* In a separate incident, J.M. threw a crowbar past another employee's feet in anger. *Id.* at 132. Forbes and Wirtz approved a three-day suspension for this transgression. *Id.* at 163. Employee J.S. also worked in a production, rather than supervisory, capacity for Filter. *See id.* at 165 (noting that his supervisor asked him to run a particular machine). He received a verbal warning from Wirtz for walking off of the job, *id.* at 165, and a written warning from Wirtz and Forbes for a separate incident involving "substandard," "very poor quality" work, *id.* at 166. Finally, the record contains relevant evidence regarding a disciplinary action taken toward long-time Filter employee R.H., also a non-supervisory employee. In response to a heated verbal altercation between R.H. and an African American employee that apparently stemmed from R.H.'s "use of racial epithets," *id.* at 128, 171, Wirtz was involved in making the decision to reassign the other employee to a different area of the plant rather than impose any sanctions or issue warnings. *Id.* at 128.[27] From these facts, we are presented with evidence of how other non-supervisory employees working under the supervision of Forbes and/or Wirtz were, at various times, disciplined.

Although the majority correctly notes that we cannot second-guess Filter's determination of what constitutes a serious offense, and, indeed, Filter's employment handbook provides a framework for the ramifications of employees' behavior, testimony before the Commission indicates the seriousness, *in Filter's management's perspective,* of these other employees'. conduct. In response to the question, "And you can't tolerate discriminatory or harassing comments made by any employee to another, can you?," Forbes testified, "That is correct." Appellant's App. p. 125. He acknowledged, however, that J.M. received nothing but a written warning for making racially inflammatory remarks to a fellow employee. *Id.* Forbes' testimony also contained the following exchange regarding R.H.'s altercation:

Q. Use of racial epithets in the workplace is pretty severe, isn't it?

A. Correct. . . .

Q. And it can cause real problems in a mixed work force, can't it, if—if, in fact, somebody's using racial epithets? Isn't that right?

A. Absolutely.

*Id.* at 128. Further, when asked, "In fact, some individuals with some longstanding time with the Company that we've talked about were allowed to go one, two and three occurrences on terminable offenses and, yet, others, such as [Brooks and

---

**27.** Brooks and Weathers present evidence of several disciplinary actions that are superfluous to our review. Felt plant worker W.R. received an oral warning for sleeping during his shift and later received a written warning for a separate incident involving the same conduct. Appellant's App. p. 168. However, there is no indication that either of these disciplinary measures was overseen by Forbes or Wirtz, the two supervisors involved in the instant case. *Id.* Similarly, employee R.H. received a three-day suspension for reporting to work under the influence of alcohol, although this disciplinary action was not imposed by Forbes or Wirtz. *Id.* at 127, 170. These disciplinary actions taken toward W.R. and R.H. are therefore difficult to include in our evaluation of Brooks and Weathers' *prima facie* case. *See Cobb,* 832 N.E.2d at 592 (quoting *Radue,* 219 F.3d at 617–18 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently. These distinctions sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination.")).

Weathers], were discharged immediately; isn't that correct?," Forbes responded, "That is correct." *Id.* at 129.[28] Indeed, the record reflects that employee J.M. committed at least one terminable offense prior to the offense for which he was terminated. *Id.* at 163. Employee J.S. committed a terminable offense—walking off of the job—but received only a verbal warning regarding his conduct. *Id.* at 165. The following month, the same employee performed such substandard work that products were rejected by Filter's customers. This, on the heels of his terminable offense, resulted in nothing more than a written warning. *Id.* at 166. It was only after he committed another terminable offense that Filter terminated J.S.'s employment. *Id.* at 167. Further, employee R.H. committed a terminable offense, was not disciplined at all, *id.* at 171, and was only terminated later after apparently stealing a tractor from the president of Filter, *id.* at 177–78.

I cannot say that the Commission, presented with testimony regarding the severity of other employees' transgressions and relative leniency toward other employees, erred in reaching the conclusion that similarly situated employees were treated more favorably than Brooks and Weathers. On appeal, *we are bound* to "read the record in the light most favorable to the administrative proceedings," and "we neither substitute our judgment on factual matters for that of the [Commission], nor do we reweigh the evidence." *Regester v. Ind. State Bd. of Nursing,* 703 N.E.2d 147, 151 (Ind.1998). Whether we, as an appellate court, might draw different conclu-

sions from the evidence is irrelevant. *State v. Carmel Healthcare Mgmt., Inc.,* 660 N.E.2d 1379, 1384 (Ind.Ct.App.1996), *trans. denied.* The Commission, faced with substantial evidence that other non-supervisory employees were disciplined less harshly than Brooks and Weathers by the same individuals for offenses considered "severe," made a valid factual determination. We cannot reweigh the evidence. I perceive no error.

Once Brooks and Weathers presented a *prima facie* case of discrimination, the burden shifted to Filter to articulate a legitimate nondiscriminatory reason for their discharge. *West,* 838 N.E.2d at 413. The Commission does not make an explicit finding of fact on this issue, but its document entitled "Michigan City Human Rights Commission Findings of Fact and Conclusions of Law[ ] Decision and Award[ ]" carefully details the time clock incident in question. *See* Appellant's App. p. 5–13. Brooks and Weathers do not contest whether Filter sufficiently articulated its nondiscriminatory reason— Wirtz's allegation of time card fraud—for their firings, and I agree with the majority that Filter met its burden of production at this step of the *McDonnell Douglas* analysis.

Finally, we reach the question of whether Filter's "nondiscriminatory reason was merely pretext for its discrimination." *West,* 838 N.E.2d at 413. In a thoughtful analysis, the majority examines the honest belief rule. However, I am concerned that the majority's pretext analysis may not sufficiently apply an objective component.

---

**28.** In a footnote, the majority explains that we are unable to discern from the record whether Brooks had any previous disciplinary violations and points out that Weathers had acquired "points" for previous violations. However, my reason for including this quotation from Forbes is to show that, according to one of the people involved in firing the plaintiffs, this was each of the plaintiff's first *terminable* offense.

The majority examines several Indiana cases and concludes, "it remains clear that Indiana courts, like all federal courts, follow the 'honest belief' rule." Op. at 574 (citing *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 214 (Ind.Ct.App.2005), *trans. denied; Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1260 (Ind.Ct.App. 2002)). I agree with this conclusion.

Certainly, this Court has previously referenced the need for an employer's honest belief in the reason given in support of an employment decision. *Purdy*, 835 N.E.2d at 214; *Powdertech*, 776 N.E.2d at 1260. The question becomes how our courts should examine what an honestly-held belief is. A close read of *Purdy* and *Powdertech* reveals language instructing an inquiry into the objective reasonableness of a proffered reason in addition to an examination of the subjective honest belief of the employer. For example, while *Purdy* declares, "[O]ur inquiry [into pretext] is limited to whether the employer gave an honest explanation for its decision.... The court need only address the issue of whether the employer honestly believes in the explanation it offers," 835 N.E.2d at 214, it also explains that an employee can prove pretext "by showing, for example, that the employer's proffered reason is factually baseless, is not the actual motivation for the discharge, or is insufficient to motivate the discharge," *id.* at 213 (citing *Powdertech*, 776 N.E.2d at 1262). Thus, both of the cases supported delving beyond inquiry into the subjective belief of an employer to examinations of the objective reasonableness of the belief. Further, we have previously *expressly* articulated that pretext should be identified by examining the "context of the surrounding circumstances." *S. Ind. Gas & Elec. Co.*, 648 N.E.2d at 682 (quoting *Ind. Civil Rights Comm'n v. Wellington Vill. Apartments*, 594 N.E.2d 518, 530 (Ind.Ct.App.1992),

*trans. denied, overruled on other grounds); Ind. Dep't of Corr. v. Ind. Civil Rights Comm'n*, 486 N.E.2d 612, 618 (Ind. Ct.App.1985), *reh'g denied, trans. denied.* Thus, we have long advocated for examining an employer's beliefs against an objective reasonableness standard. Imposing an objective standard upon this final step in the *McDonnell Douglas* burden-shifting analysis thus facilitates the sort of review that the Supreme Court envisioned when it described the *McDonnell Douglas* test as a "sensible, orderly way to evaluate the evidence *in light of common experience* as it bears on the critical question of discrimination." *S. Ind. Gas & Elec. Co.*, 648 N.E.2d at 681–82 (emphasis added) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Therefore, I agree with the majority that Indiana should expressly adopt an honest plus objective reasonableness approach to gauging whether an employer's reason for firing an employee was pretextual.

In addressing the question of whether the Commission erred in finding that Filter's proffered reason for Brooks' and Weathers' terminations was pretextual, however, I believe that the majority has espoused the correct test but applied another. Rather, the majority's analysis employs a heavily subjective test, which, in my view, does not sufficiently consider the requisite objective reasonableness component. *See, e.g.*, op. at 577–78 (discussing honest belief and "true motive" but containing no mention of objective reasonableness). Not only has the majority's analysis underemphasized the role of objective reasonableness in this inquiry, I believe that the majority has reweighed the evidence. Again, if the agency's finding on this point is supported by "*any* substantial evidence," "the court *may not* disturb the

board's or agency's decision." *Ind. Dep't of Corr.,* 486 N.E.2d at 616 (emphasis added). The Commission made the following relevant finding: "It is clear from the evidence in this matter that the stated reasons by the company for termination were pretextual and it was in fact the Claimant's [sic] race which was the motivating factor behind their discharge." Appellant's App. p. 13. This is supported by the Commission's recognition of "the lack of eyewitnesses to the alleged incident, the fact that the time clock records reflected other employees punching in at the same time on occasion and the lack of discipline for those employees," *id.* at 12, and its apparent skepticism of Wirtz's account of the incident and her investigation, *id.* at 10. Comparing the disciplinary action taken against Brooks and Weathers to the disciplinary actions described earlier in the context of the claimants' *prima facie* case, *see id.* at 11, the Commission determined that Brooks and Weathers succeeded in showing that Filter's proffered legitimate non-discriminatory reason for their terminations was pretextual. The Commission's observations are supported by the record, and it credited the testimony of certain witnesses and weighed the evidence in reaching its conclusion. Indeed, the Commission, simply put, did not believe Wirtz. We cannot disturb the Commission's finding on this point. *Ind. Dep't of Corr.,* 486 N.E.2d at 616.

This brings us to the ultimate question of whether Brooks and Weathers carried their burden of persuasion to show that they experienced discrimination. As the Supreme Court explained in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Here, Brooks and Weathers successfully made a *prima facie* case. Additionally, the Commission heard conflicting testimony regarding the alleged time clock incident, expressed skepticism toward the depth of management's investigation, and was presented with relevant evidence of significantly lesser punishments imposed for conduct deemed serious by one of the supervisors involved in Brooks' and Weathers' terminations. The Commission found this evidence sufficient to support the conclusion that Brooks and Weathers suffered employment discrimination, and the trial court agreed. In fact, in a preliminary order, the trial court observed, "The agency record is replete with evidence that could support inferences leading to a conclusion that the Petitioner illegally discriminated against the Respondents on the basis of race. As such, the factual findings and conclusions made by the Michigan City Human Rights Commission were supported by substantial evidence." Appellant's App. p. 14. In short, I believe that the majority has impermissibly reweighed the evidence. I would affirm the trial court.

We are left with the question of damages. Pursuant to its authority under the Ordinance, the Commission initially awarded $22,157.69 to Brooks and $12,090 to Weathers for lost wages. *Id.* at 12. These amounts were based upon calculations submitted to the Commission by the complainants. Upon review, the trial court remanded the matter of damages to the Commission for recalculation because the findings did not take into account the unemployment benefits received by both Brooks and Weathers. *Id.* at 18. The trial court ordered the Commission to

make appropriate findings of fact and conclusions as it relates to the damages suffered by each of the Respondents herein. Those findings should detail how those damages are arrived at by the Michigan City Human Rights Commission and should further take into consideration any unemployment compensation benefits that may have been received by [Brooks and Weathers].

*Id.* In response, the complainants and the Commission filed a Joint Request for Entry of Judgment, asking the trial court to simply subtract each complainant's unemployment benefits from her initial damages award. *Id.* at 69. Granting this request, the trial court entered judgment for Brooks in the amount of $17,469.79 and $5,613.00 for Weathers. *Id.* at 20.

Filter appeals the amounts of damages awarded to Brooks and Weathers, arguing that the awards are arbitrary and capricious. *West*, 838 N.E.2d at 415. I would affirm the trial court's award to Brooks but remand the matter of Weathers' award to the trial court for recalculation. Regarding Brooks' damages award, I would not disturb the Commission's apparent factual determination pertaining to lost overtime compensation. The Commission was presented with conflicting evidence regarding the availability of overtime for Filter employees and made a credibility determination. Appellant's App. p. 149, 158. In regard to Weathers' award, I agree with Filter that Weathers' initial award of $12,090 was unsupported by the evidence. Appellant's Br. p. 40. The document upon which this amount was based indicates that Weathers' lost wages for the relevant period[29] totaled $5,136, not $12,090. Appellant's App. p. 155. It is apparent that Weathers' earnings from other employment during this time period should have been subtracted from her anticipated earnings from Filter. This is bolstered by the fact that the Commission, in initially determining Brooks' damages ($22,157.69), reduced her anticipated earnings from Filter ($39,312) by the amount that she earned through subsequent employment ($17,154.31). *Id.* at 158. I would direct the trial court to recalculate Weathers' award.

For the foregoing reasons, I respectfully dissent. I would affirm the trial court's order affirming the Commission's determination in favor of Brooks and Weathers but would remand with instructions to recalculate Weathers' damages.

**29.** The record only contains evidence of wages lost between January and July 31, 2004. Appellant's App. p. 155. It is unclear why other evidence of lost wages was not presented, but it was incumbent upon Weathers to present her allegations of damages to the Commission.